261 F.2d 97
 John AARON et al., Appellants,
v.
William G. COOPER et al., Members of the Board of Directors
of the Little Rock, Arkansas, Independent School
District, and Virgil T. Blossom,
Superintendent of Schools, Appellees.
 No. 16094.
 United States Court of Appeals Eighth Circuit.
 Nov. 10, 1958.
 
 Thurgood Marshall, New York City, and Wiley A. Branton, Pine Bluff, Ark. (Constance Baker Motley, Elwood H. Chisolm and William L. Taylor, New York City, on the brief), for appellants.
 Donald B. MacGuineas, Attorney, Department of Justice, Washington, D.C. (William P. Rogers, Atty. Gen., Malcolm R. Wilkey, Asst. Atty. Gen., and Osro Cobb, U.S. Atty., Little Rock, Ark., on the brief) for United States, amicus curiae.
 John H. Haley, Little Rock, Ark. (Richard C. Butler and A. F. House, Little Rock, Ark., on the brief), for appellees.
 Before WOODROUGH, JOHNSEN and MATTHES, Circuit Judges.
 PER CURIAM.
 
 
 1
 This case involves events which have occurred in the Little Rock, Arkansas, school situation since our decision in Aaron v. Cooper, 8 Cir., 257 F.2d 33, and since the decision of the Supreme Court in Cooper v. Aaron, 78 S.Ct. 1399 and 78 S.Ct. 1401.
 
 
 2
 The appeal is from an order of the District Court denying and dismissing an application by appellants for a writ of injunction.
 
 
 3
 Appellants are the six remaining Negro students, of the eight referred to in the Supreme Court's opinion, 78 S.Ct. at page 1407, who were enrolled in and had continued their attendance at the Central High School of Little Rock through the last school year, and who, under the School Board's plan of integration, were to have had the right to resume their studies there for the present school year, commencing in September, 1958. Appellees are the members of the School Board and the Superintendent of Schools of the Little Rock School District.
 
 
 4
 Our decision, supra, 257 F.2d 33, was rendered on August 18, 1958, holding that the District Court had not been warranted in granting a 2 1/2-year suspension of the integration plan for the District, as approved and ordered carried into effect, merely because of the local hostility which had developed or been engendered against the initial desegregation step taken in the school system.
 
 
 5
 Thereafter, the Legislature or General Assembly of the State of Arkansas, on call issued by the Governor, convened in extraordinary session and on August 26, 1958, enacted two measures, known as Act No. 4 and Act No. 5 of the Second Extraordinary Session of the Sixty-first General Assembly, 1958. These bills, passed with emergency clauses, were signed by the Governor on September 12, 1958, the day that the Supreme Court made announcement, 78 S.Ct. 1399, of its affirmance of our decision, with direction in its order 'that the judgments of the District Court for the Eastern District of Arkansas, dated August 28, 1956, and September 3, 1957, enforcing the School Board's plan for desegregation in compliance with the decision of this Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, be reinstated'.
 
 
 6
 Act No. 4, supra, 1(A) and (B), empowered the Governor, by proclamation, to close immediately any school or all schools of a public school district, and required him in such event to call a special election, to be held within 30 days, for vote upon the alternative ballot propositions of 'For Racial Integration of All Schools Within the .......... School District', or 'Against Racial Integration of All Schools Within the .......... School District'. Unless a majority of the qualified electors of the district voted in favor of such integration, 'no school within the district shall be integrated'. 2(D). It was further provided that a school which had been closed under the authority of the Act 'shall remain closed until such executive order is countermanded by proclamation of the Governor * * *'. Sec. 4.
 
 
 7
 Act No. 5 was complementary to Act No. 4, in its provisions for withholding from a school district, in which the Governor had ordered a school closed, a pro rata share of the State funds otherwise allocable to such district and of the funds allocable from the County General School Fund, and making such withheld funds available, on a per capita basis, to any other public school or any non-profit private school accredited by the State Board of Education (of which the Governor was a member), which should be attended by students of a closed school, with an obligation being imposed upon the State Board of Education in these circumstances to make such payments. Secs. 2 and 3.
 
 
 8
 One of the grounds specified in Act No. 4, on which the Governor was authorized to close a school and call an election was, 'whenever * * * (c) he shall determine that a general, suitable, and efficient educational system cannot be maintained in any school district because of the integration of the races in any school within that district'. Another was, 'whenever * * * (a) he shall determine that in order to maintain peace against actual or impending domestic violence in any public school district, whereof the lives or limbs of the citizens, students, teachers or other employees of any school, or the safety of buildings or other property in the school district are endangered * * *'. Sec. 1(B)(c) and (a).
 
 
 9
 Commencement of the new school year for the senior high schools of Little Rock had been set by the School Board for September 15, 1958. On September 12, 1958, the day the Supreme Court announced its decision, supra, 78 S.Ct. 1399, the Governor issued a proclamation, closing all four of such schools, on the two bases under Act No. 4 set out in the preceding paragraph hereof, and calling a referendum election in the district to be held on September 27, 1958. The Board had intended simply to continue such desegregation as had been established at Central High School during the preceding year.
 
 
 10
 In a separate statement on the situation, the Governor said that 'Central High School can be operated on a private basis as a segregated school if the School Board wants to take such action'. On September 18, 1958, he made telecast of his contemplated plans for effecting such a private, segregated operation of the Little Rock high schools.
 
 
 11
 In substance, he declared that, if the vote on September 27th was against integration, the high school buildings and facilities would become surplus properties; that they thus could be 'found to be not needed for public school purposes' and could then be leased by the School Board to a bona fide private agency for the operation of private segregated schools; that such privately operated schools would not be subject to the decisions which had been rendered by the federal courts on integration, 'even though the schools received aid from State and Federal sources'; that he was informed that a private, bona fide, non-profit corporation had already been formed, 'for the purpose of being prepared to accept any offer that may be made by the Little Rock School Board to lease its unused high school facilities for private school purposes-- if the vote is against integration on September 27th'; that he was confident that the vote at the election would be against integration; and that he was under the circumstances now calling upon the School Board 'to demonstrate their good faith by immediately offering to a private group these unoccupied school buildings after the election'.
 
 
 12
 An Arkansas statute, on the books since 1875, provides: 'The directors may permit a private school to be taught in the district schoolhouse, * * * unless they be otherwise directed by a majority of the legal voters of the district'. Ark.St.1947, 80-518.
 
 
 13
 After the Governor's telecast, and four days before the scheduled election, the members of the School Board and the Superintendent of Schools petitioned the District Court, in the previous integration-plan proceeding (in which the court had reserved supplementary jurisdiction) for instructions on whether, in the situation and circumstances above detailed, they would be guilty of a violation of any of the orders which the court had made in such proceeding, if they should 'lease said school properties to private institutions for conducting a high school program on a racially segregated basis'. The petition expressly pointed out the fact that, 'If leases are consummated with such private organizations, (these) will then, upon accreditation of the schools (by the State Board of Education) be entitled to state financing under the terms of Act 5 of 1958'. The petition also frankly stated that appellees were willing to enter into such leases and would officially engage in negotiations to this end, 'if in so doing they will not subject themselves to charges of contempt for having violated a directive order of this Court'.
 
 
 14
 The court denied the petition for instructions, on the ground that it would be judicially improper for it to engage in rendering a mere advisory opinion in the situation. This ruling is not here involved, and the incident is referred to only because of the relation of the statements made by the Board in the setting which prompted appellants' injunction request.
 
 
 15
 The application of appellants to the District Court for an injunction was made on September 24th, the day following the filing of the School Board's petition for instructions. It alleged that the Little Rock Private School Corporation had by that time been formed, with the object of taking over and operating Central High School and other of the closed high schools, on a racially segregated basis, as 'private schools', and that appellees had been giving consideration to and contemplated leasing such properties to the Corporation for such purpose, in the event that the vote in the September 27th election was against integration, so that the high schools would, insofar as their operation by the District was concerned, be required by the prescription of Act No. 4 to remain closed. Showing on the application made before us for a temporary restraining order, as hereinafter referred to, indicated that there were approximately $800,000 in public funds of the State of Arkansas which would be available, under Act No. 5, supra, for operating the Little Rock high schools on such a leased, segregated basis.
 
 
 16
 The vote in the election, according to the published unofficial returns, was approximately 19,000 to 7,500, against racial integration. The election was held on a Saturday. Leasing negotiations were commenced between the Little Rock Private School Corporation and the School Board that same night, after the result of the election was known. The negotiations were continued on Sunday, September 28th, with the Attorney General of Arkansas sitting in and participating in his official capacity.
 
 
 17
 Meanwhile, counsel for appellants, after filing notice of appeal from the District Court's order of denial and dismissal of their injunction application, orally notified appellees that they were intending to make application on Monday, September 29th, at 10 o'clock a.m., in chambers, to the two Circuit Judges resident at Omaha Nebraska, for a temporary restraining order.[1] The Little Rock Private School Corporation thereupon tried to prevail on appellees to execute a lease before appellants would have the opportunity to present their restraining-order order application. At 1:30 a.m., on September 29th, the School Board adopted a resolution, authorizing its President and Secretary to execute a lease with the Private School Corporation, subject to a ruling by the Attorney General of Arkansas that such a leasing by the Board would in the situation be legal and proper. The time of 8:30 a.m. was set for the formal signing, and this act was engaged in and completed before 10 o'clock, when appellants presented their application at Omaha for a restraining order.
 
 
 18
 The School Board's resolution of authority to its President and Secretary to execute the lease made recitation of the facts that the Governor had closed the Little Rock high schools; that such properties were therefore not in use and would not be required for public school purposes until the District would again be enabled by law to operated public high schools or would need the properties for further expansion of its other educational programs; that the Board was desirous of aiding any feasible plan leading to a high school educational program in the District, 'although it is capable of and would prefer to operate its high schools as a part of the system of public education'; that the Board 'was in doubt as to the efficacy of such a leasing arrangement' and for this reason had sought instructions from the District Court on whether it would be violating the orders of the court by executing such a lease; that the Governor of the State had called upon the Board to enter into such a private-school leasing arrangement; that any attempt by the Board to have the situation clarified through further legal action would work a postponement of the starting of the private school operations and result in a further impairment of 'the high school educational program in * * * the School District'; and that the Board was accordingly declaring the four senior high schools to be surplus property, 'until such time as the Little Rock School District requires all or part thereof for the operation of its public education program', and was on this basis authorizing the execution of a lease to the Little Rock School Corporation covering such schools.
 
 
 19
 Also, the Board's resolution authorizing the lease execution had attached to it the form and provisions of the instrument which the President and Secretary were to sign. The instrument covered a purported leasing not only of the four high school buildings but also of all equipment and teaching aids located in or used in connection therewith. The term was for 7 years (which incidentally was the length of time previously fixed by the Board's plan for completing integration in the Little Rock school system), 'or for such time as the said leased property is not required for public education, whichever is shorter'. A proviso, however, was added that 'this lease shall terminate immediately and be held for naught in the event it is determined improper or invalid by final judgment of a court of competent jurisdiction'. Rent was to be paid in the amount of the actual market rental value of the property, as determined at the end of each school semester by appraisers, but, if the lessee was 'prevented from carrying out the objective of its incorporation', it was not obligated to pay rent except 'during the period of usage', allocated on a monthly basis.
 
 
 20
 The School Board assumed the obligation of Keeping the buildings in condition for the lessee's school purposes; of providing and paying for any guards necessary to insure protection of the property; and of paying for all the utility services involved in the lessee's operation. The lessee agreed to use the buildings and personal property for school purposes only and to keep its schools up to 'the highest educational standards', so that the students could 'obtain an education comparable to that obtainable in the Class A public schools of this state, including the extra-curricular activities normally enjoyed by students in other schools, with particular reference to fitting and preparing said students * * * for higher education in colleges and universities, or for employment upon the completion of technical training'. There was a provision also by which the Board subjected the Private School Corporation to the requirement of conforming to the 'Administrative Policies of the Little Rock School District', as published by the Board in September, 1955.
 
 
 21
 The arrangements arrived at between appellees and the Private School Corporation extended also to the matter of the School Board assisting in making available to the Corporation the services of the teachers of the high schools, who were under contract with the District. The School Board consented to allow the Corporation to submit contracts to the teachers, of a form approved by the Board, which contained also a special agreement for execution between the School Board and the teacher. This special agreement provided that the named teacher was tendering his or her resignation to the School District, 'saving any and all rights and privileges as authorized by Act 4' (supra), and that the School District was accepting the same, School District was accepting the same, subject to the condition that, 'should The Little Rock Private School Corporation be dissolved or discontinue the operation of any and/or all of the schools leased from the Little Rock School District, then said Little Rock School District hereby agrees to reinstate (the named teacher) to his or her previous status including salary and classification on the day immediately following his or her termination with the Little Rock School Corporation'.
 
 
 22
 It might also passingly be noted in relation to the setting that, while the Corporation was purporting to conduct merely a private school operation, there was inserted in its 'Teacher's Contract' form a provision authorizing it 'to make such deductions from the salary specified herein as may be required by Law for Teacher Retirement * * *'. The State of Arkansas provides a 'Teacher Retirement System', Ark.St.1947, Cum.Pocket Supp. Ch. 14, financed by teacher assessments and State contributions. But such 'Law for Teacher Retirement' has application only to those serving in public schools. Id., 80-1437(f) and (g). What the object or significance of the provision in the Corporation's contract, for making 'deductions * * * required by Law for Teacher Retirement', was, we do not, however, presume here to consider, since it does not perhaps have an absolute connotation against the Board, such as the other circumstances detailed have, although the Board had approved the contract form and presumably had protectively insisted upon the provision for retirement-deduction being included.
 
 
 23
 The facts which have been set out clearly call collectively, as a matter of law, for an injunction against appellees. Appellees were under specific order of the District Court to carry out the integration plan for the District, which they had adopted, and to which both that Court and this Court had given approval. Their obligation in this respect had been further accented by the denial made of their request, after interference and other difficulties had arisen, for leave to disrupt and halt the operation of the integration plan. 78 S.Ct. 1399 and 78 S.Ct. 1401, affirming 257 F.2d 33.
 
 
 24
 The edict thus reaffirmedly existing against them to move forward was in their capacity as 'the agents of the State', or in other words their representativeness of the State as to the wrong and its correction. 78 S.Ct. at page 1408. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (as emphasized in 78 S.Ct. at page 1410), had established as the supreme law of the land that it was a violation of the Fourteenth Amendment for a State or its instrumentalities to require or enforce racial segregation in its public school system. Appellees, as has been stated, stood under a specific decree of the federal courts to correct this constitutional violation as it had existed in the Little Rock School District, by putting appellants and the other members of their race into enjoyment of their rights in accordance with the provisions of the adopted and approved integration plan.
 
 
 25
 Any attempts, from whatever source occurring, to interfere with or prevent the carrying out of the integration plan, would not release appellees from the obligation of the judicial order against them. Obstructions to their taking of some step or steps in accordance with the plan might (dependent upon the circumstances) enable them to make defense to a charge of contempt for failure to execute, but this would not dissolve the order. And so, it necessarily would constitute a disregard of their obligation for appellees, because they might believe that the execution of the integration plan had been effectively interfered with, to engage or assist in anything related to the situation inconsistent affectingly with the order, while the order stood judicially unchanged. Above all, would it be legally improper for them to take any affirmative step of action or collaboration, which either was intended or manifestly would serve to hamper or thwart the execution of such order.
 
 
 26
 The order, as has been indicated, was in its effect one against them as officers or agents of the State, imposing a direct command upon them to carry out, to the full extent of their official powers, the supreme law of the land, in ridding the Little Rock school system of its unlawful segregation. The existence of such an immediate command upon them would also inherently imply a prohibition against any use by them of their state powers, which would intendedly or resultingly prevent in any manner the carrying out of their obligation under the decree to effectuate the supreme law of the land. in accordance with the approved integration plan. In the judicial hold which thus existed against them, a court would ordinarily have no difficulty in, and would vindicatingly owe the duty of, transforming this implied prohibition, where necessary, into an express injunction.
 
 
 27
 The Governor's order under Act No. 4, supra, had, of course, immediately served to close the Little Rock high schools. But the Act had not purported to abolish such schools as part of the Little Rock school system.[2] It merely provided that schools closed by the Governor should remain so until revocation of his order. Nor did 80-518, supra (the 1875 statute), impose any duty upon appellees to allow the Little Rock high schools to be used for private school purposes in such a situation. It merely empowers a school board, where it so desires, to 'permit a private school to be taught in the district schoolhouse, during such time as the said house is not occupied by a public school * * *'.
 
 
 28
 Thus, appellees in negotiating with the Little Rock Private School Corporation for use of the high school buildings and facilities by the Corporation were not even engaged in state mandated action but in voluntary acts of their own. They were simply yielding to local desire or clamor and to the importuning of the Governor that they cooperate in the purpose of Act No. 4, supra, and the Governor's action thereunder. That purpose plainly and proclaimedly was to try to thwart integration-- the thing which appellees were under judicial mandate to use their efforts and powers to achieve.
 
 
 29
 As has been observed, appellees were willing not only to lease the high school buildings to the Little Rock Private School Corporation, but also to provide the Corporation with all of the public-owned equipment and teaching facilities necessary to the conduct of such schools. And they further were willing to aid the Corporation in obtaining a teaching staff, by agreeing to allow the teachers of the high schools to sign contracts with the Corporation, without loss of their position and status in the District's school system, through obligating the Board to reinstate any such contracting teacher 'to his or her previous status including salary and classification on the day immediately following his or her termination with the Little Rock School Corporation'. And they did all of these things knowing, as their petition for instructions indicated, that the effect of these actions on their part would be to make the Corporation eligible for accreditation and allotment of state funds, under Act No. 5, supra, with which to operate such segregated high schools, in substitution or supersession of the District's mandatedly integrated schools.
 
 
 30
 However worthy appellees may claim to have been their motive otherwise, they were nevertheless acting to make public buildings, equipment and other school-operating facilities available for the conduct of such segregated, successoral high schools. And they were knowingly assisting, by their acts and by their collaboration in effecting teacher-transfer, to qualify such intended segregated schools for state operating funds under Act No. 5. These actions on their part would of necessity complicate the achieving of integration in the School District. They would also further plainly serve to thwart, frustrate or impede the carrying out of the decree against appellees and the effectuating of appellants' rights thereunder, in that, inter alia, the making available of operative, substitute, free, qualified high school facilities for the white students of the District would naturally allay most of the parental clamor and pressure which could otherwise be expected to arise against any continued closing of the high schools, and which might practicably constitute a substantial factor in relation to a reopening of the schools.
 
 
 31
 As we have said, the facts involved call, in our judgment, for an injunction against appellees as a matter of law. But it is urged that we are without jurisdiction to direct the issuance of such an injunction, for the reason that appellants' application would be legally cognizable only by a three-judge district court. The district judge, on whose docket the application appeared, denied and dismissed it on this ground, holding that he was without jurisdiction to grant relief.
 
 
 32
 In making such dismissal, the trial court was in error. Where an application for an injunction is made, which, under 28 U.S.C.A. 2281, can only be granted by a three-judge court, it is the duty of the district judge to whom it is presented, under 2284(1), to 'notify the chief judge of the circuit, who shall designate two other judges * * *'. There is no requirement in 2284 that the applicant for the injunction must determine the need for a three-judge court and make request therefor, and no provision that, if this is not done, there is a lack of judicial jurisdiction. The practical, expediting and procedural nature of the statute suggests to the contrary that the legislative intention was that the district judge to whom an application for an injunction is presented must exercise the responsibility not only of determining whether it is in fact a three-judge case or a single-judge matter but also of taking the necessary action on this basis for enabling the case to be disposed of on its merits. if the case is a three-judge matter, he must make request of the Chief Judge of the Circuit for the constituting of such a court. He may not dismiss. We have expressly held that 'a case which requires a three-judge court for any disposition of it on its merits * * * may not * * * over the objection of the plaintiff, be dismissed by a single judge'. Snyder's Drug Stores v. Taylor, 8 Cir., 227 F.2d 162, 165.
 
 
 33
 But here the error of the trial court in making dismissal was more fundamental than this, for the injunction which appellants sought was not in fact one which required a three-judge court for its issuance. The relief sought was not predicated, nor did it turn, upon any Arkansas statute or statutes being declared to be unconstitutional.
 
 
 34
 28 U.S.C.A. Sec. 2281, imposing the prescription for a three-judge court as to injunctions related to state statutes, provides: 'An interlocutory or permanent injunction restraining the enforcement * * * or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title'.
 
 
 35
 Appellants' application for an injunction did not challenge in any way, for purposes of the present case, the constitutionality of Acts Nos. 4 and 5, or Sec. 80-518, supra-- the only Arkansas statutes which are involved in the situation here. Nor does our holding, that the facts, as they have been admitted to exist, entitle appellants to an injunction as a matter of law, deal in any way with the constitutionality as such of these statutes. The propriety and legality of appellees' acts and threatened actions have been viewed simply in relation to the obligation imposed upon them by the previously existing federal court decree, without regard to whether the statutes mentioned are in themselves constitutional or unconstitutional. The only direct observation which we have made in relation to these statutes was to note that what appellees had done did not even represent acts purporting to be required of appellees by the statutes but constituted legally voluntary action on their part.
 
 
 36
 Only where it is necessary to hold a state statute unconstitutional, if the action taken by a state officer thereunder or an order issued by an administrative agency pursuant thereto is to be capable of being enjoined, does 2281 require a three-judge court. Acts of state officials, which otherwise constitute a violation of federal law, or which are on other federal grounds legally improper, in their relation to a particular situation, may afford the basis for an injunction without regard to the validity of the state statute underlying them. A three-judge district court is not required for the issuance of such injunction.
 
 
 37
 Thus, the Supreme Court has pointed out that, within the purview of the three-judge statute, an attempt to reach the unconstitutionality of the result obtained by the use of a state statute, without challenge against or required consideration of the validity of the statute itself, must be distinguished from an attack upon the constitutionality of the statute. Ex parte Bransford, 310 U.S. 354, 361, 60 S.Ct. 947, 84 L.Ed. 1249. See also Phillips v. United States, 312 U.S. 246, 252-253, 61 S.Ct. 480, 85 L.Ed. 800; Faubus v. United States, 8 Cir., 254 F.2d 797, 805.
 
 
 38
 Here the acts in which appellees engaged under the Arkansas statutes would involve a contributing to an unconstitutional result against appellants. Their action in executing a lease to the Private School Corporation was in the circumstances an attempt to provide the necessary buildings, equipment and other operational facilities of the Little Rock public schools for the maintenance of a private segregated high school system, to take the place and serve the purpose of the schools under integration edict, which the Governor had closed. Appellees also were agreeing to keep the property in condition so that the segregated school operation could be continued. They further participated in an arrangement to help the Corporation obtain teachers with which to be able to carry on the operation, by agreeing to allow the high school teachers of the District to contract to serve in the segregated system, without prejudice to their status as employees of the District, and by exercising their official power to guarantee such teachers in their segregated school service a right of return 'to his or her previous status including salary and classification on the day immediately following his or her termination with the Little Rock Private School Corporation'. And they did these things knowing that the purpose which they would thus be serving and the intention which underlay them on the part of those seeking to induce them to take the action was to enable the Private School Corporation to receive funds from the State with which to carry on the segregated school operations.
 
 
 39
 What the Supreme Court said in Cooper v. Aaron, 78 S.Ct. at page 1410, may for emphasis be repeated here: 'State support of segregated schools through any arrangement, management, funds or property cannot be squared with the (Fourteenth) Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws'.
 
 
 40
 But apart from the unconstitutionality of the result as such, which these acts of appellees would serve to effect, there is more concretely involved the fact, which we have stressed above, that what appellees have done and threatened to do is improper and unlawful as being violative of the decree against them. Not only would such action be inconsonant with the obligation of the decree but it would also directly complicate, impede, and contribute to the thwarting or frustrating of the execution of the decree and the accomplishment of the integration mandated thereunder.
 
 
 41
 It further would contribute to depriving appellants of the benefit-- in the disruption occasioned to their enjoyment of the right of desegregated school attendance, of which they had come into possession during the preceding school year-- of such public pressure as would normally otherwise arise and be likely to constitute a substantial factor against any sustained closing of the high schools of the District. The irreparableness of the injury done by any act which contributes to keeping public schools closed is, we think, apparent.
 
 
 42
 Finally appellees argue, as they have done in the previous incidents of administration and litigation which have occurred in the Little Rock school situation, that they are 'in a position of neutrality', and so should be treated as being 'but nominal parties to this proceeding', with the Private School Corporation being regarded as an indispensable party to any injunction consideration.
 
 
 43
 The District Court, this Court, and the Supreme Court have all recognized the previous good faith of appellees. But what they have now done and threatened to do can hardly legally be viewed as a matter of neutrality in relation to the court decree against them. Complicating, impeding and assisting to effect a frustration of the execution of the decree cannot be termed legal neutrality. Nor could a position of neutrality continuingly serve to satisfy appellees' obligation under the decree. They are under mandate, as the agency through which the State has committed the constitutional violation existing in the Little Rock School District, to move forward to correct that violation, by carrying out the integration plan. Implicit in this mandate of moving forward to carry out the plan necessarily is a reasonable exercising by them of such legal powers as they possess, to try to achieve that integration.
 
 
 44
 Clearly, they are entitled to be stopped from taking any contemplated step in the opposite direction-- and especially so where those steps are legally voluntary on their part, as they are here. And it does not require the presence of any other party in order to be able to stop them from taking any such contemplated step. We could not, of course, formally adjudicate the invalidity, so as to decree cancellation, of the lease instrument which has been made, in the absence of the Little Rock Private School Corporation as a party. But the presence of the Corporation is not needed to put appellees under injunction to prevent them from taking any further steps violative of the decree against them.
 
 
 45
 If the Private School Corporation believes itself possessed, on what has occurred, of a legal right to have the buildings, equipment and teaching facilities of the Little Rock high schools turned over to it, for operating a segregated high school system, as a means of filling the educational gap created in the community by the closing of such schools to prevent integration, it is at liberty to intervene in the District Court, within 10 days after the issuance of our mandate, and seek a formal determination of that question, within the apparent intendment of the provision of the lease that 'this lease shall terminate immediately and be held for naught in the event it is determined improper or invalid by final judgment of a court of competent jurisdiction'.
 
 
 46
 The briefs of appellants and of the Government as amicus curiae have set out and discussed the line of cases in which lessees of public property have in the circumstances of the particular situation involved, on the theory of state instrumentality, been held to be subject to the obligation of the State against racial discrimination. See Derrington v. Plummer, 5 Cir., 240 F.2d 922; Department of Conservation & Development, Division of Parks, Com. of Va. v. Tate, 4 Cir., 231 F.2d 615; Kerr v. Enoch Pratt Free Library of Baltimore City, 4 Cir., 149 F.2d 212; Lawrence v. Hancock, D.C.S.D.W.Va, 76 F.Supp. 1004. Similarly, cases in other areas in which State action has been pierced and found to represent a stratagem or device resorted to for purposes of preserving racial discrimination have also been referred to in the briefs. See Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Smith v. Allwright 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Perry v. Cyphers, 5 Cir., 186 F.2d 608; Rice v. Elmore, 4 Cir., 165 F.2d 387.
 
 
 47
 The effect of all these cases, in their relation to the present situation has been epitomized by the Supreme Court in Cooper v. Aaron, 78 S.Ct. 1401, 1409, as follows: 'In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously".
 
 
 48
 But we do not now assume to deal with the significance of these holdings and expressions in relation to the present situation, at least not beyond the acts and contemplated actions of the School Board, since these alone are adjudicatorily before us.
 
 
 49
 The order of the District Court dismissing appellants' application for an injunction is hereby vacated; and the cause is remanded to that Court with directions to enter an order of injunction against appellees, enjoining them from taking any further steps or action, without the approval of the District Court, to transfer possession, control or operation, whether directly or indirectly, of any of the senior high schools or any other property or facilities of the Little Rock School District, to any organization or person, for carrying on any segregated school operations of any nature; enjoining them also from engaging in any other acts, whether independently or in participation with anyone else, which are capable of serving to impede, thwart or frustrate the execution of the integration plan mandated against them; and further providing that they shall take such affirmative steps as the District Court may hereafter direct, too facilitate and accomplish the integration of the Little Rock School District in accordance with the Court's prior orders.[3]
 
 
 50
 The order herein directed shall also be made to run and have application to the successors of appellees; and the officers, agents, servants, employees and attorneys of appellees and of their successors; and all persons in active concert or participation with appellees or with their successors.
 
 
 51
 The preliminary or interlocutory injunction issued herein shall stand and remain in effect, until the injunction herein ordered shall have been entered by the District Court and become effective.
 
 
 52
 Judgment vacated and cause remanded for entry of order of injunction as herein directed; and preliminary injunction issued herein continued in effect until entry of injunction ordered in the District Court.
 
 
 
 [1]
 Although 28 U.S.C.A. 1651(b) empowers an individual judge to issue an alternative writ or rule nisi, it has been the practice of the members of the Court of Appeals for the Eighth Circuit, by agreement among ourselves, to require (except in an extreme emergency situation) that any application for a writ receive the consideration of at least two judges of the Court, either as a quorum of the Court itself, if it is in session, or as a matter of concerted judgment in respect to individual action on the part of the senior of the two judges, if the Court is in adjournment and no special session has been authorized. This practice has been followed also as to applications for special stays, applications for bail, etc
 The object of the practice is to prevent any attempt at 'shopping' as to such applications; to make the soundness of the action on such applications more certain; and to avoid the public unseemliness of a single circuit judge setting up his judgment against that of another individual judge (district judge).
 In the situation here involved, the Court was in adjournment at the time appellants sought to present their application for an emergency restraining order, and there was not sufficient time to have the Chief Judge of the Court constitute and designate a division or panel of judges for a court hearing. Besides, the application was one being made without service of written notice as required by our Rule 18, 28 U.S.C.A. for submission of a matter to the Court. Appellants therefore could only undertake to present their application at chambers, and the only place in the Circuit where there were two judges together at the time, enabling them to make such application in accordance with the practice of the Court, was at Omaha, Nebraska. It was for this reason and on this basis that chamber presentation, consideration and ruling were engaged in at Omaha.
 A restraining order was issued, and the matter was set down for hearing before the Court, at St. Louis, Missouri, on the question of a preliminary or interlocutory injunction. Such injunction against appellees was granted and is in effect, until the further order of the Court. Meanwhile the case was advanced for hearing on its merits, which is the matter now before us.
 
 
 [2]
 Parenthetically it may be noted that Art. 14, 1, of the Constitution of Arkansas, adopted in 1874, provides: 'Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction'. And the Supreme Court of Arkansas has held that high schools are embraced within the term 'system of free schools'. Dickinson v. Edmondson, 120 Ark. 80, 170 S.W. 930, 932, Ann.Cas. 1917C, 913
 
 
 [3]
 It is of course not the intention of this provision of our order that appellees shall take only such affirmative steps to carry out the integration plan as the District Court may expressly direct. Appellees have an obligation under the previous general order against them to move forward, within their official powers, to carry out the integration plan, to which they must commensurately respond on their own initiative