Georgia Theresa **GILMORE** et al.,
Plaintiffs-Appellees,

v.

**CITY OF MONTGOMERY** et al.,
Defendants-Appellants.

No. 72-1610.

United States Court of Appeals,
Fifth Circuit.

Feb. 9, 1973.

Joseph D. Phelps, Walter J. Knabe, Drayton Hamilton, W. Inge Hill, Montgomery, Ala., for defendants-appellants.

Truman Hobbs, Montgomery, Ala., amicus curiae.

Solomon S. Seay, Jr., Morris Dees, Joseph J. Levin, Jr., Montgomery, Ala., for plaintiffs-appellees.

Before MORGAN, CLARK and INGRAHAM, Circuit Judges.

CLARK, Circuit Judge.

The City of Montgomery makes football, basketball, and baseball facilities owned and operated by it available to private groups, including schools, churches, civic clubs and charitable organizations.[1] Plaintiffs, black residents of Montgomery, utilized this long standing class action proceeding[2] to

---

1. The city schedules private events on a prior reservation basis, subject to a preference given to public schools and to the Park and Recreation Board. Private organizations are granted the exclusive possession of municipal facilities during scheduled contests and are allowed to set, collect, and retain admission fees. There is no charge for use of municipal baseball and basketball facilities or for the daytime use of football stadiums. A fee of 25 dollars to 60 dollars, depending on the amount of electrical lighting involved, or 5% of the gate, whichever is greater, is charged for night use of the football stadiums.

2. The decision below is reported at 337 F. Supp. 22 (M.D.Ala.1972). One previous opinion is reported at 176 F.Supp. 776 (M.D.Ala.1959), aff'd as modified, 277 F.2d 364 (5th Cir. 1960). An interim unreported order requiring equalization of recreational facilities in black neighbor-

seek an injunction against the City's practice of permitting the use of these public recreational facilities by racially segregated private schools and clubs. The district court granted an injunction, *inter alia*, prohibiting the use of city-owned recreational facilities by any private school which is racially segregated or by any private group, club, or organization, other than a private school, which has a racially discriminatory admissions policy. The full text of the order portion of this injunction is set out in the margin.[3] We hold this order of the district court overbroad and affirm only to the extent that the City be enjoined from permitting the use of public recreational facilities for official athletic contests and similar functions involving racially segregated private schools and school affiliated groups.

## I.

### SEGREGATED PRIVATE SCHOOLS
#### A. The Facts

This case involves the recurrent problem of the use of public property by segregated private schools in school districts under court order to desegregate public schools. *Cf.* Graves v. Walton County Bd. of Education, 465 F.2d 887 (5th Cir. 1972); McNeal v. Tate County School District, 460 F.2d 568 (5th Cir.

1972); Wright v. City of Brighton, 441 F.2d 447 (5th Cir.), cert. denied 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190 (1971).

In 1964 the district court held that Montgomery schools were being operated on a segregated basis in violation of the Fourteenth Amendment and ordered the desegregation of four grades in the fall of that year. Carr v. Montgomery County Bd. of Education, 232 F.Supp. 705 (M.D.Ala.1964). *See also* 253 F. Supp. 306 (M.D.Ala.1966) and 289 F. Supp. 647 (M.D.Ala.1968), aff'd 395 U. S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). In August, 1969, the district court found that the freedom-of-choice plan which had been in effect since 1967 had not been effective in disestablishing the dual school system and, accordingly, the court directed the United States, through the Department of Health, Education and Welfare to formulate a comprehensive desegregation plan for Montgomery County. This plan which would have eliminated virtually all one-race schools in the city was approved by the district court in February, 1970, and affirmed with minor modifications by this court, 429 F.2d 382 (5th Cir. 1970).

Prior to implementation of this comprehensive desegregation plan in Montgomery, there had been limited use of public stadiums and similar facilities

hoods was entered January 21, 1971. In related litigation, the maintenance of segregated recreational programs through the subterfuge of a "private association" has been enjoined. Smith v. Y.M.C.A. of Montgomery, 316 F.Supp. 899 (M.D.Ala. 1970), aff'd 462 F.2d 634 (5th Cir. 1972).

3. 1. That the City of Montgomery, Alabama's policy and practice of permitting the use of city owned or operated recreational facilities by any private school, or private school affiliated group, which school or group is racially segregated or which has a racially discriminatory admissions policy be and the same is hereby declared unconstitutional.

2. That said City of Montgomery, Alabama, its officers, agents, servants, employees, and those acting in concert with it, be and each is hereby enjoined from permitting or in any way sanctioning the use of city owned or operated recrea-

tional facilities by any private school, or private school affiliated group, if such school or group is racially segregated or if it has a racially discriminatory admissions policy.

3. That said City of Montgomery, Alabama's policy and practice of permitting the use of city owned or operated recreational facilities by any private group, club or organization which has a racially discriminatory admissions policy be and the same is hereby declared unconstitutional.

4. That said City of Montgomery, Alabama, its officers, agents, servants, employees and those acting in concert with it, be and each is hereby enjoined from permitting or in any way sanctioning the use of city owned or operated recreational facilities by any private group, club or organization which is not affiliated with a private school and which has a racially discriminatory admissions policy.

by private schools. However, in fall, 1971, at least four private schools with all-white enrollments, each of which had expanded its enrollment and extracurricular program subsequent to the extensive desegregation of Montgomery public schools, scheduled their home football games in public stadiums.[4] One of these schools has announced that it will not enroll black students. The others have "declared" open enrollment policies but, in point of fact, none of these private schools have Negro students enrolled.

The district court found that by allowing private schools to schedule their athletic contests in public facilities, "Montgomery is providing aid to private, segregated schools, thus encouraging and facilitating their establishment and operation as an alternative for while students who in most instances are seeking to avoid desegregated public schools. . . . [T]he creation and operation of these private, segregated schools is to the detriment of a racially balanced public school system in Montgomery, Alabama." 337 F.Supp. at 24–25. Specifically, the court found that the use of public athletic facilities aids such private schools in at least three direct ways: (1) the opportunity to play athletic contests in public facilities "contributes considerably to the attractiveness" of the all-white private schools and draws white students from public schools, thus increasing the difficulty of desegregating public education; (2) the use of public facilities saves the capital outlay required to build similar facilities; and (3) the City's action in granting the schools exclusive possession of city property for the duration of the contest provides a means by which the schools can raise extra revenue through the sale of tickets and refreshments.

## B. The Law Applicable to the Injunction, in General

■■ Subsequent to the implementation of a comprehensive school desegretation plan in Montgomery, new segregated private schools were established, enrollment in existing all-white private schools increased, and simultaneously, these schools began to make frequent use of public recreational facilities for their official school functions. Because of the court's prior mandate to Montgomery to eliminate racial discrimination in education, and in light of the capacity of all-white private schools to frustrate this goal, any state involvement with such schools is subject to special scrutiny. McNeal v. Tate County School Bd., *supra*, 460 F.2d at 574–575.[5] It is well established that federal courts may enjoin any state assistance to private school organizations which serves to "impede, thwart or frustrate the execution of the integration plan mandated against [a public school district]." Aaron v. Cooper, 169 F.Supp. 325, 336 (E. D.Ark.1959), applying on remand the principles laid out by the Supreme Court, Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) and the Eighth Circuit, 261 F.2d 97 (1958).[6]

4. The relative proportion of public and private school usage of public athletic facilities is indicated by the schedule of football games at Goodwyn Field in Autumn, 1971: of 31 total games scheduled, 14 involved all-white private schools, 16 were contests between public school teams, and in one game the home team was a desegregated Roman Catholic School.

5. *Cf.* Bright v. Isenbarger, 314 F.Supp. 1382, 1392–1394 (N.D.Ind.1970), aff'd 445 F.2d 412 (7th Cir. 1971); Powe v. Miles, 407 F.2d 73, 81 (2nd Cir. 1968).

6. In *Cooper*, the Supreme Court, referring to the actions of public officials in Little Rock, Arkansas, who were assisting the creation of a segregated private school system, declared:

. . . the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously."

Also see Griffin v. County School Bd., 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

The adverse effects of the creation of all-white private schools on public school desegregation have long been recognized in this circuit. United States v. Jefferson County Bd. of Education, 372 F.2d 836, 849 (1966), aff'd en banc 380 F.2d 385, cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). More precisely, we have recognized that the departure of white students and teachers into private educational institutions disrupts planned desegregation of the public school system and causes resegregation,[7] that such "white flight" has the potential to reduce community support and resources available for public education,[8] and that resulting racial isolation perpetuates the stigma long associated with racially segregated education.[9]

■ Indeed, the effect of the enrollment of white children in private segregated schools is not unlike the creation of "splinter" school districts which contain proportionately more white children than the existing district. The creation of such splinter districts has been held unconstitutional where "the secession has a substantial adverse effect on desegregation of the [remaining] school district." Lee v. Macon County Bd. of Education, 448 F.2d 746, 752 (5th Cir. 1971). While public authorities are not required to achieve racial balance within each school within

their jurisdiction, where *de jure* segregation has existed they are required to "make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." Davis v. Bd. of School Comm. of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). Carving out a new, substantially whiter splinter school district is inconsistent with this affirmative duty. Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); United States v. Scotland Neck City Bd. of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972).

■ Thus, neither through splinter public school districts nor through private school systems may officials whose community is subject to a desegregation order assist the establishment or maintenance of segregated educational systems which accomplish indirectly what the court has forbidden such officers to accomplish directly. Cooper v. Aaron, *supra*; Lee v. Macon County Bd. of Education, 267 F.Supp. 458, 475–476 (M.D. Ala.), aff'd sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

■ The district court found that by allocating exclusive possession of public recreational facilities such as football stadiums, baseball diamonds, basketball courts, and tennis courts for official athletic contests and similar functions sponsored by racially segregated private

---

Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84, 87.

. . . State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws. 358 U.S. at 17–19, 78 S.Ct. at 1409–1410.

7. *E. g.*, Boyd v. Pointe Coupee Parish School Bd., 332 F.Supp. 994 (E.D.La. 1971). See also, *e. g.*, United States v. Scotland Neck City Bd. of Education, 407 U.S. 484, 490, 92 S.Ct. 2214, 2218, 33

L.Ed.2d 75 (1972); Monroe v. Bd. of Comm. of City of Jackson, 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1968); United States v. Hinds County School Board, 433 F.2d 598, 601 (5th Cir. 1970).

8. *E. g.*, United States v. Hinds County School Bd., 433 F.2d 605, 609 (5th Cir. 1970).

9. *E. g.*, Wright v. City of Brighton, *supra*, 441 F.2d at 451; Poindexter v. La. Financial Assistance Comm., 258 F.Supp. 158, 163 (E.D.La.1966) and 275 F.Supp. 833, 851 (E.D.La.1967), aff'd 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).

schools, the City provides a publicly supported means by which these schools may generate revenue for the support of their activities. Of more practical significance, the court found that by using existing public facilities, these schools can avoid the substantial capital investment required to build comparable facilities, as well as current expenditures for maintenance and repair.

Notwithstanding the importance of these financial benefits, we would emphasize that "this is not merely a controversy over a sum of money." Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959, 967 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). In the case at bar, the district court recognized that the opportunity to use public stadiums and similar facilities for official school functions enhanced the attractiveness of segregated private schools. Students and their parents will be more attracted by a private school which, with public assistance, can offer a complete extracurricular program comparable in all aspects with that offered in public schools. Without reaching the broader issue of whether the operation of the segregated private schools themselves involves state action, we hold that the findings and conclusions of the court are supported by the record and are sufficient to sustain that portion of the injunction which forbids scheduling athletic contests and similar functions which involve segregated private schools in municipal facilities.

## C. The Distinction Between Exclusive and Nonexclusive User

The district court found that granting exclusive possession of public recreational facilities to segregated private schools for the purpose of official school functions will significantly affect desegregation of the public school system. Therefore, the court was well within the ambit of its equitable discretion in enjoining city officials from permitting such usage.

However, to the extent that the court's order may be read to prohibit the use and enjoyment of public recreational facilities by individual children or groups of students enrolled at private schools in common with other members of the public, we find the order to be overbroad. The children enrolled in private schools have an unquestioned right as citizens to make use of all municipal recreational facilities. The Supreme Court has pointed out that, while the Constitution requires public authorities to abstain from assisting certain private schools, "it does not require the state to be their adversary." Everson v. Bd. of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947).

Permitting private school groups to enjoy such recreational facilities as zoos, museums, and parks or to attend, along with other citizens, civic and cultural events conducted in city recreational facilities does not involve the same degree of affirmative state action as granting exclusive control of public facilities for private school functions. Nonexclusive use of governmental facilities and services does not provide a means by which schools may raise revenue. No schools public or private, were shown to have constructed or maintained facilities such as zoos, parks and the like. Thus, the opportunity to make communal use of this type of recreational facility does not enable the private school to duplicate public school operations at public expense. The nonexclusive enjoyment of municipal recreational facilities by private school children was not proven to present a sufficient threat to desegregated public education to support an injunction restraining the clear personal right of the affected children to enjoy such usage in common with the rest of the public.

## D. Distinction Among Segregated Schools on the Basis of Declared Enrollment Policy

On appeal we are asked to make a distinction between the use of public

facilities by private schools which have an announced policy of accepting only white students and by those schools which, though never having enrolled a black child, have declared an "open admissions" policy. This distinction would be inconsistent with the rationale for our limited affirmance of the injunction. The basis for the district court's action lies in its authority to prevent impediments by public authorities which hinder the accomplishment of the constitutional duty, specifically recognized in earlier courts of that court, to desegregate the Montgomery public school system. It was well within the ambit of the district court's discretion to find that the right of black children to enjoy a desegregated public education could be frustrated as effectively when whites leave the public system for private schools which are segregated adventitiously as when their "flight" is to private schools which are segregated as a matter of school policy.[10] Therefore, we affirm the decision of the district court not to distinguish among segregated schools on the basis of their admissions policies.[11]

## II.

## NON-SCHOOL ORGANIZATIONS

██ The district court also enjoined the City of Montgomery from permitting the use of municipal recreational facilities by all private organizations, including churches, civic clubs, social, fraternal, and charitable societies, which have a "racially discriminatory admissions policy."[12] This part of the injunction involves very different considerations from the preceding sections dealing with segregated private schools and school affiliated groups. While the injunction against private school usage is based upon the affirmative obligation of public authorities to eliminate educational segregation, the injunction against similar usage by non-school organizations must rest, if at all, upon a general constitutional prohibition against state-sponsored racial discrimination.

Subsequent to the decision below, the Supreme Court delivered its opinion in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), involving the constitutionality of granting a state liquor license to a fraternal organization with a racially discriminatory membership policy. In Irvis, the Supreme Court reversed an injunction forbidding licensing the Moose Lodge until it ceased its discriminatory practices. In so doing, the Court pointed out:

> The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessi-

10. *Cf.* King, Rebuilding the "Fallen House"—State Tuition Grants for Elementary and Secondary Education, 84 Harv.L.Rev. 1057, 1081 (1971).

11. We need not reach the question of what degree of actual desegregation of a private school student body might deprive a court of its discretion to find that the effect of public involvement with such a private school is inconsistent with the due performance by public officials of their prior court ordered duty to achieve a unitary public school system. That issue is not presented in this case. Nor do we attempt to predict whether, as substantial accomplishment of the mandate

to establish a unitary school system occurs, the adverse effect of private school use of public facilities may diminish or disappear, thus making the present injunction no longer appropriate. *Cf.* Wright v. City of Emporia, *supra*, 407 U.S. at 470, 92 S.Ct. at 2207.

12. The district court made no findings about the history, frequency, or effects of public recreational facilities by such non-school affiliated private organizations. Furthermore, in this case which was tried on stipulated facts nothing was stipulated which would support this prong of the injunction.

ties of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from State conduct set forth in The Civil Rights Cases [109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883)] and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition.

407 U.S. at 173, 92 S.Ct. at 1971. Distinguishing its earlier decisions involving state-supported discriminatory refusal of service in private restaurants, Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963) and Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the court held that the state licensing of the Harrisburg Moose Lodge did not significantly affect the right of minority groups to purchase liquor or to obtain club licenses for themselves. 407 U.S. at 176, 92 S. Ct. at 1973.

 *Irvis* requires reversal of that portion of the district court's order which deals with non-school affiliated groups. *Irvis* involved the licensing of an otherwise private club located in a private building, while the present case involves the use of publicly owned recreational facilities. The use of public property brings this case closer to the

facts of *Burton*. There are, however, two controlling distinctions. First, the periodic use of recreational facilities by private clubs does not approach the "symbiotic relationship" between the public parking authority and the private lessee that was present in *Burton*. Second, *Burton* involved a restaurant holding itself out as a place of public accommodation. The injunction in the present case, like the injunction in *Irvis*, affects bona fide private social and religious organizations. The freedom to choose one's associates in private clubs, churches, and civic organizations is an important constitutional right and a basic principle of our pluralistic society. *See e.g.,* Evans v. Newton, 382 U.S. 296, 298–299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966); NAACP v. Button, 371 U. S. 415, 444–445, 83 S.Ct. 328, 344, 9 L. Ed.2d 405 (1963); Emerson, Freedom of Association and Freedom of Expression, 74 Yale L.J. 1 (1964). Where there is no significant effect on the countervailing rights of excluded individuals,[13] such private groups cannot be denied access to public recreational facilities solely because of their discriminatory admissions policies.[14] *Cf.* Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

## III.

### CONCLUSION

On remand, the district court is directed to limit its injunctive order by deleting paragraphs 3 and 4 relating to private non-school groups, clubs and organizations and by amending para-

13. *Compare* Wesley v. City of Savannah, 294 F.Supp. 698 (S.D.Ga.1969). *Cf.* Falkenstein v. Dept. of Revenue for the State of Oregon, 350 F.Supp. 887 (D.Or. 1972); McGlotten v. Connally, 338 F. Supp. 448 (D.D.C.1972); Pitts v. Dept. of Revenue for the State of Wisconsin, 333 F.Supp. 662 (E.D.Wis.1971).

14. This case does not involve any evasion of the city's responsibility to operate

recreational facilities on a desegregated basis by the subterfuge of converting such facilities to private control. *See, e. g.,* Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir.), cert. denied, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 170 (1962); *Cf.* Palmer v. Thompson, 403 U.S. 217, 222–223, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971).

graphs 1 and 2 to make clear that the City of Montgomery is not prohibited from permitting nonexclusive access to public recreational facilities and general government services by private schools or school affiliated groups.

Remanded, with directions.