Delois **YARBROUGH** et al., Plaintiffs,

v.

The **HULBERT–WEST MEMPHIS SCHOOL DISTRICT NO. 4 OF CRITTENDEN COUNTY, ARKANSAS,** a Corporation, et al., Defendants.

No. J–65–C–8.

United States District Court
E. D. Arkansas,
Jonesboro Division.

June 18, 1965.

George Howard, Jr., Jack Greenberg, Derrick A. Bell, Jr., John Walker, New York City, for plaintiffs.

Herschel H. Friday, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for defendants.

GORDON E. YOUNG, District Judge.

The plaintiffs are minor Negro children attending the schools of Hulbert-West Memphis School District No. 4 of Crittenden County, Arkansas and their parents. They proceed by way of a class action on behalf of themselves and others similarly situated to assert rights under the due process and equal protection clauses of the United States Constitution. The defendants are the School District, the Superintendent of Schools, and the members of the Board of Directors of the School District. The plaintiffs will be collectively referred to herein as "plaintiffs" and the defendants will be collectively referred to herein as "defendants". Generally stated, the plaintiffs alleged that the defendants, acting under the color of State law, have pursued a policy of compulsory segregation in the schools of the District and, although petitioned by the plaintiffs to desegregate the schools, the defendants have declined to do so. Plaintiffs asked the Court to enter a decree requiring the immediate desegregation of the schools of the District and of the teaching and professional staff or in the alternative to file a desegregation plan. Attorneys' fees were requested, and the Court was asked to retain jurisdiction of this case pending approval and implementation of defendants' plan. The defendants answered in due course, from which it appears that the schools of the District have been heretofore operated on a segregated basis, and in which the defendants prayed that if the plaintiffs were given injunctive relief requiring the desegregation of the schools that the defendants be afforded an opportunity to present a desegregation plan.

A hearing was held before the Court on March 8, 1965, at the close of which the Court ordered the defendants to desegregate the schools of the District as required by the United States Constitution as interpreted by the Supreme Court of the United States, and afforded defendants an opportunity to formulate and file a desegregation plan. The defendants filed their Report and Motion on April 19, 1965, setting forth the desegregation plan proposed by them and requesting the Court to approve the plan. The desegregation plan may be summarized as follows (the summary will follow the Articles appearing in the plan):

I. Defendants propose to complete the desegregation within three years, starting with the school year 1965–1966. Grades 1 to 6, inclusive, are to be desegregated in the school year 1965–1966; Grades 7 to 9, inclusive, are to be desegregated in the school year 1966–1967; and Grades 10 to 12, inclusive, are to be desegregated in the school year 1967–1968. The desegregation is to be accomplished on the basis of a school preference or freedom of choice procedure. Defendants propose to give public notice of the plan by publishing the entire plan for two consecutive weeks, with the first publication to be at least fourteen days prior to the pre-school registration of first grade students and fourteen days prior to the distribution of school preference forms for assignments in the grades to be desegregated in 1965–1966.

II. Defendants point out that a kindergarten is not operated so that the first contact between the students and the District is when the students enter the first grade. Pre-school registration of entering first graders was set for May 14, 1965 (this was subsequently changed to May 21, 1965) between the hours of 9:-00 a. m. and 4:00 p. m. Parents and

guardians of entering first graders were advised that students could be registered at the school of their choice, with the choice to be exercised on an appropriate form presented to each registering student. The form simply listed the elementary schools of the District in alphabetical order and advised that a check mark was to be placed in the appropriate space opposite the school chosen by the student and parents or guardians for initial assignment for the school year 1965–1966. Students are to be assigned to the school chosen unless the assignment would result in overcrowding at that school. In the event of overcrowding, assignments are to be made on a non-discriminatory basis with preference to be given to those choosing that school who reside closest to that school. Students whose choices are rejected will be given the opportunity to state another choice for initial assignment which choice in turn will be granted unless overcrowding results, in which event preference will be given to students residing closest to that school. It is provided that the choice of schools is granted to the student and parents or guardians and that teachers, principals, and other school personnel are not to advise, recommend or influence a decision, and are not to favor or penalize because of the choice made. Provision is made for a subsequent registration during the week immediately preceding the opening of schools for those who do not register during the first registration, but preference in initial assignments will be given to the students who register during the first registration. As developed at the trial, the plan makes it mandatory that all entering first graders make a choice as to the school they desire to attend and no entering first grader will be assigned or permitted to attend any school unless a choice is made. Similar procedures as to entering first graders are to be followed each year.

III. Article III of the plan deals with all students in the School District other than first grade students. Generally stated, initial assignments for the 1965–1966 school year are to be made on the basis of giving a choice to all students enrolled in Grades 1, 2, 3, 4 and 5 at the close of the 1964–1965 school year as to the school in the District they desire to attend during the 1965–1966 school year. Each such student is to exercise the choice on a form which lists the elementary schools of the District in alphabetical order and advises that a check mark is to be placed in the appropriate space opposite the school chosen by the student. The form is to be distributed by classroom teachers and returned either to the teacher or to the superintendent within the time fixed by the Board, which must not be less than one week. Initial assignments are to be made in accordance with the choices stated on the preference forms unless overcrowding results, in which event assignments are to be made on a non-discriminatory basis with preference to be given to those choosing a particular school who reside closest to that school. Students whose first choice is rejected because of overcrowding will be given an opportunity to make a second choice which in turn will be granted unless there be overcrowding at the school chosen, in which event assignments will be made on a non-discriminatory basis to that school with preference given to those residing closest to the school. Each student involved in the grades affected (that is, those who will be in Grades 2 to 6, inclusive, during the 1965–1966 school year) is advised that if a choice is not exercised, the student will be initially assigned to the school presently attended. Students in all other grades are assigned for the 1965–1966 school year to the school presently attended. Similar procedures are followed for initial assignments for the 1966–1967 school year except the desegregation will affect students who are in Grades 6, 7, and 8 at the close of the 1965–1966 school year who will be in Grades 7, 8, and 9 during the 1966–1967 school year. Those students will be given a choice, which choice will be routinely granted unless overcrowding results, in which event assignment will be on the basis of residence proximity to the overcrowded school as

heretofore discussed, with the other students in the system being reassigned to the schools presently attended. Students in Grade 6 going to Grade 7 will be required to make a choice, since a level change is involved (that is, from elementary school to junior high school), but students in Grades 7 and 8 going to Grades 8 and 9 will be advised that if they do not make a choice they will be reassigned to the school presently attended. Initial assignments for the school year 1967–1968 will be on the basis of granting all students enrolled in Grades 6, 9, 10, and 11 at the close of the 1966–1967 school year, who will be in Grades 7, 10, 11, and 12 during the 1967–1968 school year a choice as to the school they desire to attend. Similar procedures will be followed in granting the choice and in handling an overcrowded situation. It will be mandatory that students in the sixth grade going to the seventh grade and students in the ninth grade going to the tenth grade make a choice since level changes will be involved. However, students who will be leaving the tenth and eleventh grades going to the eleventh and twelfth grades will be advised that if they do not make a choice they will be reassigned to the school presently attended. In subsequent years, initial assignments will be on the basis of granting preferences to entering first graders and those in Grades 6 and 9 going to Grades 7 and 10 respectively, with all other students in the system to be initially assigned to the schools then attended. As will appear subsequently, there are more than two elementary schools in the District, but at the present time there are only two junior high schools and only two high schools. Therefore, so long as there are only two schools, a second choice will not be available in the event of overcrowding and the assignment will of necessity be to the other school. Provision is made, however, for the granting of a second choice at any level in which subsequent construction results in there being more than two schools at that level. As in the case of entering first graders, express

provision is made for the choice being that of the students and parents or guardians and advice is given that teachers, principals and other school personnel are not to advise, recommend or otherwise influence a decision, and such school personnel are not to favor or penalize any student because of the choice made.

IV. Article IV deals with all other students newly enrolling in the District and provides that as to any student who is to be assigned to a grade for the applicable school year that has been or is being desegregated pursuant to the provisions of the desegregation plan, he will be furnished with an appropriate preference form for use by him and his parents or guardians in exercising the right to state a preference for initial assignment to a school in the School District. As in the case of other forms, this form is to list the schools at the applicable level and advise that a check mark is to be placed in the appropriate space opposite the school chosen. Assignments are to be made in accordance with the choice made unless overcrowding results in which event the student will be given an opportunity to make a second choice if there be more than one school at the level involved.

V. Article V deals with lateral transfers and provides that the School District may reassign students upon its own motion or upon request. All requests are to be made upon an appropriate form and the Board is to approve or disapprove the request within thirty days. The policy of the Board is stated to be that reassignments or lateral transfers will be granted only in the event of unusual circumstances "and in any event all standards applied by the Board of Directors in acting on reassignments requests must be non-discriminatory and uniformly applicable to all students."

VI. Article VI deals with transportation and states simply that the Board of Directors will operate all school buses in a non-discriminatory manner and that all students will be assigned to buses without regard to race.

VII. Article VII deals with the teaching and professional staff and states that the Board will undertake and complete as expeditiously as possible the desegregation thereof with the end in view of recruitment and assignment without regard to race. For the 1965–1966 school year the Board agrees that faculty meetings, teachers' meetings, principals' meetings and in-service workshops will be desegregated and conducted on a nonracial basis.

VIII. Article VIII is the miscellaneous article and provides that assignments and reassignments will be made by the Board but in order to expedite, the superintendent is authorized to make temporary assignments subject to subsequent formal action by the Board. It was developed at the hearing that all facilities and services of each school would be available to all students attending that school without regard to race. And there will be no screening and no application of any criteria, such as those embodied in the pupil assignment approach to desegregation, whereby selection would be made among students.

The plaintiffs filed their objections to the desegregation plan, which, briefly stated, are as follows:

1. The plan does not meet the speed and thoroughness requirements of the Supreme Court in that the Board has not discharged its burden of justifying any further delay; and a preference or choice plan is an inadequate vehicle for desegregating the schools of the District;

2. The lateral transfer provisions are vague and work to perpetuate segregation;

3. No provision is made for establishing "a set of school zone lines on a non-racial basis";

4. No provision is made for discontinuing racial factors in planning school curricular and activities, facilities, budgets and disbursements of funds;

5. The plan does not set out procedures by which faculty and professional staff desegregation will be implemented;

6. The proposed notice is inadequate;

7. No provision is made for first and second school choices and the requirement that the student and parents should sign ought to be eliminated;

8. The time periods for effectuating pre-registration and executing preference statements are too short; and

9. The plan makes no provision for providing plaintiffs and other Negroes above Grade 9 a realistic opportunity to attend desegregated schools.

Defendants responded to plaintiffs' objections in due course, and the matter was set down for a hearing before the Court on May 26, 1965. The evidence developed the following facts:

West Memphis, Arkansas is a fast growing community located in Eastern Arkansas on the Mississippi River near Memphis, Tennessee. The District embraces West Memphis and surrounding territory. During the last ten years the school population in the District has more than doubled with the result that there has been a continuing building program. Heretofore the schools of the District have been entirely segregated, with the schools that are entirely Negro being Wedlock Elementary, Mack Elementary, Wonder Elementary, Jackson Elementary, Wonder Junior High School, and Wonder Senior High School; and with the schools that are entirely White being Richland Elementary, Maddux Elementary, Weaver Elementary, Dabbs Elementary, West Memphis Junior High, and West Memphis Senior High. Based on 1964–1965 average daily attendance figures, there were 2,437 Negro students in the system and 3,097 White students in the system. All of the present school buildings have been constructed since 1947, and since 1954 all of the present buildings heretofore occupied by Negro students have been constructed except Mack Elementary School, and all of the present buildings heretofore occupied by White students have been constructed since 1954 except Bragg Elementary,

Dabbs Elementary and West Memphis Junior High School (except that an addition has been constructed thereto). Construction is programmed at this time for Jackson Elementary School, to be in operation for the 1965–1966 school year, and the District is in the progress of a study for additional construction.

Substantially the same curriculum is offered at the various schools for the applicable levels with any differences being brought about by the demands of the students as to some elective aspects of the program. For example, it appeared that girls' basketball is part of the extra-curricula program at Wonder High School and that tennis and golf are part of the extra-curricula program at West Memphis Senior High School. It appeared that throughout the years there has been a marked difference in achievement levels between Negro and White students in the school system with the greater difference being at the higher grade levels. However, progress has been made in this regard, with the goal of equalizing achievement being sought. According to the Superintendent, there appears to be no reason why any substantial difference in this regard cannot be eliminated in time. He also testified the same procedures are being followed with reference to teaching staff quality in that every effort is being made to recruit and assign teachers who will offer substantially the same quality of instruction at the various schools of the District. Part of this program has been to promote school attendance because without school attendance real progress cannot be made with reference to improving achievement levels. In this regard, a truant officer has recently been employed to concentrate on achieving maximum attendance among Negro students, where deficiencies have heretofore existed.

While it is true that the District had not voluntarily undertaken actual desegregation of the schools of the system prior to the filing of this lawsuit, and while this has resulted and will result in some students being deprived of an integrated education, it appears to the Court that the defendants are prepared to proceed in good faith in administering the plan that they have proposed. Furthermore, the Court believes that the defendants have sufficiently justified the need for the three years that will be involved in desegregating the schools under the proposed plan. There is some dispute in the evidence as to the exact nature and extent of the demand for desegregation, but the Court does not view this as a vital matter for present purposes. The defendants have now recognized their obligations and the true test will be whether they carry them out in a constitutional manner, properly recognizing the constitutional rights of all interested parties.

The defendants advised the Court that even though the proposed desegregation plan had not been approved, they felt that the school authorities should proceed with the giving of notice of the plan and the taking of preferences for the grades being desegregated in the 1965–1966 school year prior to the end of school in May 1965. This was done so as to avoid the expense and administrative difficulties involved in taking the preference statements after school had adjourned. Accordingly, the entire desegregation plan with appropriate dates was published in The Evening Times, a newspaper of general circulation published in the School District, on Thursday, May 13, 1965, and on Thursday, May 20, 1965. In addition, a front page article appeared in the Thursday May 13, 1965 edition of the paper (which was introduced in evidence at the trial) explaining the desegregation plan and calling attention to the pre-school registration date and to the dates that preference forms would be distributed for students who would be in Grades 2 to 6, inclusive, the next school year. The Superintendent testified that he and the Board members generally acquainted patrons in the District with the proposed plan, and that he informed his principals of the details of the plan for the purpose of having them explain it to pupils and their parents. While plain-

tiffs object to the adequacy of the notice, it appears to the Court under all of the circumstances that all patrons of the District either had actual notice of the plan and the details thereof or had a fair opportunity to obtain notice. The results to date of Negro students who have indicated a preference to attend schools formerly attended solely by White students are as follows:

For the 1965–1966 School Year

| | |
|---|---|
| 7 | Students in the Second Grade |
| 6 | Students in the Third Grade |
| 1 | Student in the Fourth Grade |
| 9 | Students in the Fifth Grade |
| 5 | Students in the Sixth Grade |
| 28 | Students Total |

The pre-school registration for first graders produced only 175 registrants out of an anticipated 600-plus registrants. Only 45 of these were Negro, and none stated a preference for schools heretofore attended solely by White students. However, the bulk of the first graders has yet to register and it is, therefore, unknown at this time which schools they will choose. Eight of the 28 students filed their requests outside of the time set by the Board, but the Board has informed the Court that all eight will be accepted along with the other 20 so that all of these students have had their preferences routinely granted.

Turning to the objections of the plaintiffs, the first and most important matter raised is whether or not the proposed desegregation plan represents a permissible approach under governing constitutional principles in the light of the facts existing in this District. Plaintiffs' objections Nos. 1 and 3 are involved here. In other words, plaintiffs state that the preference or choice plan is an inadequate vehicle to reorganize the schools of this District and urge that the plan is defective because it makes no provision for establishing a set of school zone lines on a non-racial basis. In other words, plaintiffs appear to assert that the defendants, under the facts of this case, must proceed on an attendance area or unitary zone basis in order to meet constitutional requirements for the desegregation of the schools.

With regard to this basic contention, the Court has concluded that the defendants' proposal does represent a permissible approach and should be approved as reasonable and proper under the existing circumstances, with, of course, any proper party having the right to subsequently raise a justiciable issue as to implementation. In the first place, the basic responsibility and authority for operating the schools in a constitutional manner rest upon school boards and school authorities rather than the Courts. The question is not what the Court would do if it were operating the schools, but whether the defendants are proceeding in a permissible manner from a constitutional standpoint. As stated by the Supreme Court in the second Brown decision (Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954):

"School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles."

In Briggs v. Elliott, a three-judge District Court for the Eastern District of South Carolina, composed of Circuit Judges Parker and Dobie and District Judge Timmerman, 132 F.Supp. 776 (1955), the Court stated at page 777:

"Having said this, it is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states."

In Aaron v. Cooper, 169 F.Supp. 325 (E.D.Ark.1959), this Court quotes with approval its previous statement in 143 F.Supp. 855 (1956), 864, at page 334 of 169 F.Supp.

"It is not the duty or function of the federal courts to regulate or take

over and operate the public schools. That is still the duty of the duly state - created school authorities * * *."

As far as the District Courts are concerned, they have been charged to exercise "practical flexibility" to see that a transition to a properly desegregated school system is undertaken and concluded by school officials as expeditiously as possible. There appears to be no set pattern, plan or procedure that is required for any particular locality and the numerous reported decisions reflect multiple approaches. However, it does appear that insofar as general patterns are concerned, the two principal approaches, from the standpoint of constitutional requirements, have been (1) unitary zoning or attendance areas, and (2) freedom of choice or preference (with pupil assignment being a variation thereof which permitted, in practical operation, some selecting or screening by use of the criteria embodied in pupil assignment laws). For example, the Court of Appeals for this Circuit has approved the Arkansas Pupil Assignment Law as being facially constitutional (Parham v. Dove, 271 F.2d 132 (8th Cir. 1959), and has authorized the use of the pupil assignment approach by school districts in solving their desegregation difficulties. In Dove v. Parham, 282 F.2d 256 (8th Cir. 1959), Chief Judge Johnsen referred to the Pupil Assignment Act as "constituting a 'legislative non-racial scheme', intended to serve in effecting student location through 'over-all pattern', instead of by promiscuous result", and in the opinion in that case stated (page 262 of 282 F.2d):

"[6] Where a board has adopted a definitive plan of effecting desegregation by reasonable transitional steps, the racial question necessarily is geared to the scope of those steps. But only in that sense and within that need, we think, is there basis to say that consideration in assigning students may be given to race. The board may in such a situation find it necessary to make selection between Negro students, and it will be enti-

tled to do so on proper judgment as to what will best serve to accomplish its program. However, as we have said above, it has no right to resolve or take action at any time on the basis that it is better for some individual not to have the enjoyment of his constitutional right."

In Norwood v. Tucker, 287 F.2d 798 (8th Cir. 1961), the Court of Appeals stated with reference to the question of whether or not the Little Rock School District had to follow an attendance area approach:

"* * * we must rule that the Board was not rendered without authority to modify, or, more accurately stated, to supplement such plan by applying the factors and criteria set forth in the assignment laws, so long as they are not applied in an artificial manner and for the purpose of continuing segregation in the Little Rock Schools."

It appears to the Court that the defendants' desegregation plan eliminates the features of the Pupil Assignment approach that may be objectionable in that there is no screening and no selecting. Complete freedom of choice is permitted, with no unduly burdensome administrative procedures, and the only restriction upon that complete freedom is the practical one of overcrowding. And, if there is overcrowding, then assignments must be made on a non-discriminatory basis without regard to race, color or national origin in that students are assigned to overcrowded school on a residence proximity basis. Furthermore, it seems that the basic principle underlying the preference or choice approach has been recognized by language in various Supreme Court decisions. For example, in Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), the Supreme Court struck down a transfer provision which had been approved by the Court of Appeals for the Sixth Circuit permitting transfers between schools on the basis of race because the classification violated the equal protection

clause of the Fourteenth Amendment. But, in its opinion the Court stated:

> "In doing so, we note that if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or to transfer to another."

And subsequently in the opinion:

> "Likewise, we would have a different case here if the transfer provisions were unrestricted, allowing transfers to or from any school regardless of the race of the majority therein."

See also Calhoun, et al. v. A. C. Latimer, et al., 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288 (1964), wherein the Supreme Court had under review the Atlanta School District desegregation procedures and sent the case back to the District Court for further development of the facts. The Supreme Court noted that during the argument of the case it was pointed out that the Atlanta School Board had adopted provisions authorizing transfers "with certain limitations" in the City's high schools and that the School Board had gone on record since the trial of the case in the District Court setting forth the factors the Board would consider in making initial assignments of students and permitting transfers. It seems obvious that if the Supreme Court intended for an attendance or unitary zone approach to be the only constitutional permissible procedure to be followed in desegregation, it would have said so.

Also, it seems to the Court that such a procedure, if fairly administered (the Court, of course, assumes and expects that this will be the case), may afford a greater opportunity for students to get an integrated education. See for example the results depicted by some of the reported cases as flowing from the attendance area approach, which reflect that under changing neighborhood patterns schools often revert to an almost completely segregated status. See Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963), and Downs v. Board of Education of the City of Kansas City, Kansas, 336 F.2d 988 (10th Cir. 1964), Cert. Den., 380 U.S. 914, 85 S. Ct. 898, 13 L.Ed.2d 800.

Even now, as this is being written, Negro civil rights groups are staging "sit-downs" in the streets of Chicago, charging that its School Board's "neighborhood" policies of school attendance areas promote and maintain segregation.

In the Downs case, the Court stated:

> "Appellants also contend that even though the Board may not be pursuing a policy of intentional segregation, there is still segregation in fact in the school system and under the principles of Brown v. Board of Education, supra, the Board has a positive and affirmative duty to eliminate segregation in fact as well as segregation by intention. While there seems to be authority to support that contention, the better rule is that *although the Fourteenth Amendment prohibits segregation, it does not command integration of the races in the public schools and Negro children have no constitutional right to have white children attend school with them.*" (Emphasis supplied.)

Therefore, the plaintiffs' objections to the overall approach embodied in defendants' desegregation plan must be rejected, and the Court hereby approves the freedom of choice approach as set forth therein as being constitutionally permissible.

The Court has carefully considered the other objections raised by the plaintiffs and concludes that they must be overruled. A detailed discussion is not necessary. However, the Court will briefly discuss them.

With reference to the speed, it seems that under all of the circumstances three years is acceptable. This may result in some Negro students at the higher grade levels being deprived of an opportunity to obtain an integrated education, but this seems to be the necessary result of any desegregation plan. In view of the defendants' acceptance of its responsibilities, and in view of the showing made with reference to the many factors involved in successfully completing desegregation, the Court cannot conclude that three years is too long a period. The defendants have committed themselves to continuing their program of equalizing achievement levels and equalizing quality of education so that all students in the District, regardless of race, will have an equal opportunity to get substantially the same education.

As to any students who do not exercise a choice for an integrated education at the first opportunity, another opportunity will be afforded at each level change. This is consistent with sound educational practices and balances the overall educational program from an individual and School District standpoint against the desires of students to change schools more often than at level changes. In other words, it is sound educational practice that a student who has adjusted to contacts, relationships and curriculum should not change from that environment to a new and strange environment in another school except under exceptional circumstances. Certainly it would be unwise to permit pupils to transfer back and forth among schools at will.

■ Of course, lateral transfer rights do exist which must be uniformly granted without regard to race. In this regard, the evidence developed that lateral transfers would normally arise in circumstances whereby one student moves from the proximity of one school to another and desires to transfer for that reason or where special education type classes are available only in one school. The Court realizes that it is impossible for the defendants to cover every possibility, but the important thing is that the announced policy must be adhered to. All such transfers must be on the basis of standards equally applicable to all students without regard to race, color or national origin. This, it seems to the Court, adequately meets plaintiffs' objections that the lateral transfer provisions are too vague.

■ With reference to the objections concerning teacher and professional staff desegregation, it is true that the defendants have not promulgated exact criteria whereby this desegregation will be accomplished. They frankly admit that they do not know at this time the best method for accomplishing this desegregation. However, the important thing is that the defendants recognize and assume the responsibility to proceed as expeditiously as possible to accomplish satisfactory desegregation of the teaching and professional staff. And, certain steps are to be taken immediately in this regard. In view of the steps being taken with reference to desegregation from the standpoint of the students, and in view of the commitment made by the defendants, nothing further is required of the defendants in this particular at this time. It is, however, expected that the defendants will proceed as they state and will formulate an acceptable teacher and professional staff desegregation proposal with all deliberate speed.

The other objections have already been covered in this opinion. While the notice might not be all that the plaintiffs desire, it appears that it has been adequate under the circumstances; if a situation arises requiring second choices in accordance with the desegregation plan, it is expected that the defendants will proceed as they state in the plan, and under the developed facts the periods allocated for registration and executing preference statements were adequate. At least, the facts do not reflect that anyone has been deprived of an opportunity to make an effective preference.

■ There remains the issue of the prayer of the plaintiffs for attorneys' fees. The Court has carefully considered

this and it appears that this is a matter within the sound discretion of the Court. See Rogers, et al. v. Paul, et al., 345 F.2d 117 (8th Cir., May 7, 1965). Under all the facts and circumstances, it seems to the Court that allowance of attorneys' fees to the plaintiffs is not warranted in this case and this prayer of the plaintiffs should be denied.

A decree in accordance with the above will be entered.