**Delores CLARK et al., Appellants,**

**v.**

**The BOARD OF EDUCATION OF the LITTLE ROCK SCHOOL DISTRICT et al., Appellees.**

No. 18368.

United States Court of Appeals Eighth Circuit.

Dec. 15, 1966.

Henry M. Aronson, New York City, for appellants. John W. Walker and Harold Anderson, Little Rock, Ark., and Jack Greenberg, James M. Nabrit, III, and Michael Meltsner, New York City, were on the printed brief.

Herschel H. Friday, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for appellees and filed printed brief.

Before VOGEL, Chief Judge, GIBSON, Circuit Judge, and REGISTER, District Judge.

GIBSON, Circuit Judge.

This appeal presents another of a long series of complaints against the operation of the Little Rock School system and specifically concerns the constitutionality of a school desegregation plan submitted by the Board of Education and approved by the United States District Court for the Eastern District of Arkansas. The appellants are five Negro children acting for themselves and as representatives of a class of children similarly situated. The desegregation plan is known generally as a "freedom of choice" plan.

The present case has numerous ancestors that have preceded it before this and other courts. The litigation began ten years ago with the filing of a class action seeking the desegregation of the public schools of Little Rock, Arkansas, Aaron v. Cooper, 143 F.Supp. 855 (E.D.Ark. 1956). The Board in that case proposed a gradual desegregation plan, to be fully implemented by 1963, based upon geographical attendance zones. We approved that plan in Aaron v. Cooper, 243 F.2d 361 (8 Cir. 1957), with the understanding that the District Court would retain jurisdiction to insure the effectuation of the transition to a racially nondiscriminatory school system. The attempted implementation of the plan, however, resulted in the well-known difficulties at Central High School in 1957. Continued official resistance to the law resulted in the enjoining as part of the original Aaron case of various persons, including the Governor of Arkansas, from interfering with the desegregation steps. Thomason v. Cooper, 254 F.2d 808 (8 Cir. 1958); Faubus v. United States, 254 F.2d 797 (8 Cir. 1958), cert. denied 358 U.S. 829, 79 S.Ct. 49, 3 L.Ed.2d 68. We were then forced to deny an attempt to place a two and one-half year moratorium on integration. Aaron v. Cooper, 257 F.2d 33 (8 Cir. 1958), affd. 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5. An "emergency session" of the Arkansas legislature in August 1958 resulted in the enactment of legislation under which the Governor closed the Little Rock schools for the 1958–1959 school year, which closing was subsequently held unconstitutional. Aaron v. McKinley, D.C., 173 F.Supp. 944 (3-judge Court 1959), affd. sub nom. Faubus v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237. Thereafter, the Board sought to lease the public school facilities to a private school system operating on a racially segregated basis. This Court enjoined that transfer Aaron v. Cooper, 261 F.2d 97 (8 Cir. 1958).

The Board continued to fight on. The 1959–1960 school year found the Board assigning students to schools on the basis of criteria found in an Arkansas pupil assignment law. §§ 80–1519 through 80–1547 and 80–1234 Ark.Stats., 1947, Vol. 7 (1960 Replacement). We held in Parham v. Dove, 271 F.2d 132 (8 Cir. 1959) that this statute was not unconstitutional on its face. Thereafter, a number of students challenged the deviation from the geographical boundaries, and we then held that since the deviations were due to racial discrimination the application of this plan was unconstitutional; and we again called the Board and its representatives' attention to the continuing injunction in the first Aaron case requiring them to " 'take affirmative steps, on their own initiative' to facilitate and accomplish operation of the school district on a nondiscriminatory basis." Norwood v. Tucker, 287 F.2d 798, 809 (8 Cir. 1961).

Thereafter, the Board adapted its use of the pupil assignment law to give total consideration to choices, which were given to students at certain grade levels. During the spring of 1964 a choice was given to grades one, four, seven, and ten. Over 180 Negro pupils made choices of assignment to former all-white schools. Most of the requests were granted, but the request of plaintiff Moore was denied.

Shortly before the beginning of school in September 1964 Roosevelt Clark moved his family to Little Rock and sought to enroll his four children in nearby predominately white schools. Clark's wife initially was advised in a telephone con-

versation with the Board's administrative staff to enroll her children in a named white elementary school and a named white junior high school in her general residential area. Upon attempting to do so, she was refused and her four children assigned to "Negro" schools near their home.

Because of the denial of their choices, the Clark and Moore children sought to intervene in the Norwood v. Tucker action, which was still within the jurisdiction of the District Court. Intervention was denied because of the presentation of different issues. Thereafter, this suit was filed. The Clark children were, after this trial was concluded (January 6, 1966) but before judgment on their complaint, voluntarily assigned to the schools of their choice; and, by Order of the District Court the Moore child was allowed to transfer to the school she desired to attend.

The Board formally abandoned use of the pupil assignment law on April 22, 1965 and adopted a "freedom of choice" type plan. During the litigation the plan was amended on November 26, 1965 in an attempt to make the final plan conform with the requirements set forth in Kemp v. Beasley, 352 F.2d 14 (8 Cir. 1965). It was approved as amended by the District Court. With the individual plaintiffs attending the schools of their choice and the Board's adoption of a plan deemed by the Court to be constitutional, the action was dismissed.

Plaintiffs are attacking the approval of the Board's plan and the dismissal of the action. As we understand plaintiffs' argument they are challenging the constitutionality of a "freedom of choice" plan under the circumstances of this case. It is their position that a "freedom of choice" plan is, at most, a transitional plan. Owing to the Board's prior commitment to a geographical boundary plan and its failure to use "deliberate speed" in the implementation of the Brown decision, they contend a "freedom of choice" plan should not be approved. Further they point to statistics which indicate that a "freedom of choice" plan is, in fact, not achieving an integrated school system.

Plaintiffs also attack the particulars of this plan. Plaintiffs object to the lack of provisions for notice. They object to the "lateral transfer" provision because it fails to require the student to make an annual choice, and they object to the lack of positive guidelines set up to implement staff desegregation.

## THE CONSTITUTIONALITY OF THE "FREEDOM OF CHOICE" METHOD

 We do not believe that a general attack on the constitutionality of the "freedom of choice" method of ending school segregation is well taken at this time. This method has been tentatively accepted by this and other courts as well as the Department of Health, Education, and Welfare (H.E.W.). Kemp v. Beasley, supra. Of course, this is not to say that such a system is not open to unconstitutional abuse in its individual application, nor is it to say that should the future prove this method incapable of fully and adequately implementing the requirements of Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) it may not be cast aside by the courts. Our approval of a "freedom of choice" plan in *Kemp* was necessarily provisional; the proviso being that the plan be so conceived and so operated by the Board that it would in fact as well as theory afford full constitutional rights to every Negro child to attend a school in a school system operated on a nonracial basis. An adequate "freedom of choice" plan that accords with the H.E.W. guidelines and provides a meaningful annual choice, easily indicated, we think, could prove useful in achieving a nonracially operated school system. Of course, the Board must actually in good faith adhere to the spirit as well as the letter of this type of plan and affirmatively take all steps necessary to afford the constitutional guarantee of equal protection to all pupils under the Court's sanction of immediately setting up single geographic school zones on a completely

non-racial basis as was originally contemplated in the Board's proposed and approved plan in the first *Aaron* case. Dual attendance zones have no place in a constitutionally operated school district under the rulings of *Brown* and its progeny. We reiterate, as stated in *Kemp* at page 22 of 352 F.2d: "Finally, the fully effective plan must eliminate bi-racial attendance zones and the assignment of students to schools operated on such a segregated basis." At this point in time, however, we do not believe that this "freedom of choice" plan has proved a failure.

The end of segregation in Little Rock has been marked by anything but "deliberate speed." Attempts to end segregation have been countered by tactics of delay, evasion, legislative and executive interference, and disobedience to the law. Nonetheless, we do not believe the Board's past history unalterably bound it to the continued use of geographical boundaries, Norwood v. Tucker, 287 F.2d 798, 802 (8 Cir. 1961), nor should it prevent initiation of a plan that would presently remove all the constitutionally objectionable barriers to attendance of schools on a non-segregated basis. Many of the problems encountered are not of the Board's making or choosing and, we believe, the Board has evidenced a genuine desire to follow the commands of the *Brown* case to ultimately place into effect a non-racially operated school system. We think, with the few exceptions to be noted herein, the "freedom of choice" plan adopted by the Board for immediate application, if carefully surveyed and properly administered, would establish a constitutional non-segregated system of education. We know of no legal or equitable reason why the Board should not be permitted to presently initiate this plan.

Plaintiffs are disturbed because only 621 of 7,341 Negroes in the Little Rock school system of 23,000 (as of 1965) were actually attending previously all white schools. Thus, they argue that the "freedom of choice" plan is not succeeding in the integration of the schools.

Though the Board has a positive duty to initiate a plan of desegrega-

tion, the constitutionality of that plan does not necessarily depend upon favorable statistics indicating positive integration of the races. The Constitution prohibits segregation of the races, the operation of a school system with dual attendance zones based upon race, and assignment of students on the basis of race to particular schools. If all of the students are, in fact, given a free and unhindered choice of schools, which is honored by the school board, it cannot be said that the state is segregating the races, operating a school with dual attendance areas or considering race in the assignment of students to their classrooms. We find no unlawful discrimination in the giving of students a free choice of schools. The system is not subject to constitutional objections simply because large segments of whites and Negroes choose to continue attending their familiar schools. It is true that statistics on actual integration may tend to prove that an otherwise constitutional system is not being constitutionally operated. However, these statistics certainly do not conclusively prove the unconstitutionality of the system itself.

One of the primary alternatives to a "freedom of choice" method is the plan being urged upon us by plaintiffs. It is based solely upon fairly drawn geographical attendance areas. Nonetheless, due to established housing patterns this admittedly constitutional alternative can, and often does, result in very little actual integration of the schools. In the "freedom of choice" plan, there is at least the opportunity to break away from these housing patterns, something not possible with the establishment of rigid attendance zones.

In short, the Constitution does not require a school system to force a mixing of the races in school according to some predetermined mathematical formula. Therefore, the mere presence of statistics indicating absence of total integration does not render an otherwise proper plan unconstitutional.

Furthermore, the figures given by the plaintiffs are out of date. They were

taken from the 1965–1966 school year in which only a limited partial "freedom of choice" was being given. The plan was not amended to afford the full rights now given until the early months of 1966. In its brief the Board assures us that more than 1,360 Negro children are now attending previously all-white schools. This is more than double the number so attending the previous year. It indicates to us that the children are making effective choices that are being honored by the Board and the actual integration desired by plaintiffs is, in fact, taking place at an accelerated pace.

### EXERCISE OF THE CHOICE

The plan approved by the District Court provided for compulsory choice of schools by students (or their parents) prior to enrolling in grade school, junior high school, and high school (grades one, seven, and ten), as well as by all new students entering the system. The choice of school is to be honored as a matter of course absent problems of overcrowding. In the event of overcrowding, priority will be given to the students living closest to the school. The other students will be given a second choice.

Though no particular objection is made to this segment of the plan, plaintiffs do object to the administration of the plan. Plaintiffs argue that the free choice supposedly given the students is interfered with by the Board in its operation of an orientation program. This program, plaintiffs contend, effectively channels Negro students into Negro schools and white students into white schools.

An orientation program can be a laudatory activity, not only in upgrading the quality of, and interest in, education, but particularly here, in informing the students and parents of their rights under the new "freedom of choice" plan. But this program, may be utilized to perpetuate patterns of school segregation, and the courts should, under the circumstances, pay careful attention to its administration. The Board has pledged "not to advise, recommend, or otherwise influence" the choices of the students. Yet, as history indicates generally, and this series of litigation particularizes, what is pledged and what is practiced are often not the same.

■ If the program is designed to, or in fact does, intimidate or influence the students in their choice of schools, so that Negro children are induced to attend Negro schools, this would be unconstitutional state action in violation of the rights to equal protection and due process of law. This is true whether the inducements be open and brazen or quiet and subtle.

■ The District Court made no finding on, and the record is sorely lacking as to, the mechanics of the orientation program and whether the program is, in fact, interfering with the free choices guaranteed by law. Therefore, the District Court is directed to retain jurisdiction of this matter and determine if the Board is honoring its pledge of noninterference, or if, on the other hand, the mechanics and operation of this orientation program are designed to, or in fact are, interfering with the rights of the students. If the District Court finds any unconstitutional use being made of the program it has the necessary authority to bring an end to such abuse.

### LATERAL TRANSFERS

Students other than those entering grade, junior high, and high school are given an annual right to transfer schools but are not compelled to make any choice during the interim years. If they fail to exercise their right and apply for, what the Board designates a "lateral transfer", the students will continue to attend the school of their last choice for another year. These "lateral transfers", when requested during the appropriate time, will be honored as a matter of course, absent problems of overcrowding.

■ Plaintiffs object to this segment of the plan, arguing that the H.E.W. Guidelines state that the student be re-

quired to make a choice annually.[1] They argue that since the Board plan does not require an annual choice the plan is unconstitutional. We do not accept this argument. Regardless of the requirements of the H.E.W. Guidelines, we do not believe a "freedom of choice" plan to be constitutional must *require* the student to make an annual choice. To be constitutional we have held that the plan must only afford the student the *right* to make an annual choice, and should he fail to exercise that right the student's assignment of school must be based upon criteria other than race. Kemp v. Beasley, supra. The Constitution imposes no duty upon the students to exercise an annual choice. We believe they are protected from discrimination as long as they have the absolute right to choose and are adequately informed of this right.[2]

In the plan before us the students are required to choose before entering the first, seventh and tenth grades. They are not, however, "locked" to their initial choice. They are afforded an annual *right* to transfer schools if they so desire. The failure to exercise this right does not result in the student being assigned to a school on the basis of race. Rather, the student is assigned to the school he is presently attending, by reason of a choice originally exercised solely by the student.

We recognize the administrative difficulties encountered in a "freedom of choice" system, and we believe the approach taken by the Board to lessen these difficulties is permissible. Once the student is attending the school of his choice, the Board is entitled to assume he is satisfied with the choice until it is properly informed of the student's desire to transfer. It need not demand that the student go through the formal motions of exercising a choice each year.

## NOTICE REQUIREMENTS

Plaintiffs object to the absence in the plan of the strict notice requirements set forth in the H.E.W. Guidelines, 45 C.F.R. § 181.46, though the order of the District Court specifically required the Board to adopt reasonable rules to adequately inform the students and their parents of their rights under the system. As far as the record discloses, the plan itself only requires a limited public notice and the delivery of notice to the student by the classroom teacher. This we do not believe to be reasonable notice and is a defect in the plan that must be remedied.

There has been a long established pattern of attending segregated schools in Little Rock, and the Board has seen fit to place the primary burden of disestablishing this pattern upon the Negro community. Therefore, every precaution should be taken to fully inform these people of their rights under this new and unfamiliar system. Only by thorough notice can we be assured that the students and parents in Little Rock are fully aware of their newly accorded rights. Only when the affected persons are aware of their rights can we be assured that they are making independent and informed choices.

---

1. Guidelines, 45 C.F.R. § 181.43:
 "Annual Mandatory Exercise of Choice
 "Each student must be required to exercise a free choice of schools once annually. A student may not be enrolled or assigned to a school without exercising his choice, except as provided in § 181.45 below."

2. The plaintiffs and the Board are not in agreement on whether the latest Board's resolution adopting a "freedom of choice" plan is set up according to the minimal guidelines of H.E.W. The District Court Memorandum Opinion in approving the plan specified that the pupils be accorded "an annual freedom of choice." Regardless of which party is correct the District Court has the authority to insist that proper and adequate provisions be incorporated in the "freedom of choice" plan, that the plan provide for an annual "freedom of choice," that the plan be administered in good faith in a constitutional permissible fashion, and to order the Board, in addition, to take any other and further affirmative action necessary to achieve and operate a non-racial school system in complete and current compliance with the constitutional principle of equal protection of the law.

The Board, no doubt, realizes that the H.E.W. Guidelines set forth detailed notice requirements which are not even approximated by the notice provisions in the plan. The H.E.W. Guidelines certainly should be given serious consideration by the Board in the framing of future Board policy, because they will be given considerable weight by the courts in determining the acceptability of a desegregation plan. Singleton v. Jackson Municipal Separate School District, 355 F.2d 865 (5 Cir. 1966); Kemp v. Beasley, supra.

Perhaps the Board, pursuant to the District Court's order has already positively committed itself to undertake a notice program inspired by the H.E.W. Guidelines. If it has, the Board is to be commended. If it has not, the Board should be required to positively commit itself to this or an equally adequate plan and submit it for approval by the District Court.

## STAFF DESEGREGATION

Plaintiffs have objected to the absence of specific outlines in the plan for desegregation of the teaching staff. The Board indicates that by resolution of April 1, 1966, it actually adopted all of the Guidelines of H.E.W. However, it appears to us that the Board resolution of April 1, 1966 is no more than a declaration of intention and as such the Board has not actually committed itself in the approved plan to any of the specific demands of the H.E.W. Guidelines relating to staff desegregation.

■■■ We agree that faculty segregation encourages pupil segregation and is detrimental to achieving a constitutionally required non-racially operated school system. It is clear that the Board may not continue to operate a segregated teaching staff. Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Smith v. Board of Education of Morrilton School District, No. 32, 365 F.2d 770 (8 Cir. 1966); Kemp v. Beasley, supra.

It is also clear that the time for delay is past. The desegregation of the teaching staff should have begun many years ago. At this point the Board is going to have to take accelerated and positive action to end discriminatory practices in staff assignment and recruitment.

■■■ First, as the Board has already positively pledged, future employment, assignment, transfer, and discharge of teachers must be free from racial consideration. Two, should the desegregation process cause the closing of schools employing individuals predominately of one race, the displaced personnel should, at the very minimum, be absorbed into vacancies appearing in the system. Smith v. Board of Education of Morrilton School District, No. 32, supra. Third, whenever possible, requests of individual staff members to transfer into minority situations should be honored by the Board. Finally, we believe the Board should make all additional positive commitments necessary to bring about some measure of racial balance in the staffs of the individual schools in the very near future. The age old distinction of "white schools" and "Negro schools" must be erased. The continuation of such distinctions only perpetrates inequality of educational opportunity and places in jeopardy the effective future operation of the entire "freedom of choice" type plan.

■■■ We recognize the difficulties involved in the reassignment of long time members of the staff who have established close working relationships with the rest of the school's faculty and who, perhaps, have established homes near their place of work. However, the attrition of retirements and resignations should afford ample opportunity for recognizing the rights of current staff members to continued employment. We recognize, too, that significant progress has already been made by the Board.[3] Therefore,

3. According to the Board, beginning with 1966–1967 school year some fifty-two teachers were teaching in minority situations. Faculty meetings and work-shops were conducted on a non-racial basis beginning with the 1965–1966 school year. There is no evidence of any discrimination in the rate of pay.

we do not believe the imposition of a set time table with fixed mathematical requirements is the necessary answer at this time. Neither do we feel the answer to be a complete absence of any positive programs for future action. The lack of a definite program will only result in further delay of long overdue action. We are not content at this late date to approve a desegregation plan that contains only a statement of general good intention. We deem a positive commitment to a reasonable program aimed at ending segregation of the teaching staff to be necessary for the final approval of a constitutionally adequate desegregation plan. Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965).

Therefore, in addition to the requirements specifically set forth above, the District Court should require the Board to include in its plan a positive program aimed at ending in the near future the segregation of the teaching and operating staff. The District Court should thereafter retain jurisdiction for the length of time necessary to insure that these commitments are honored.

We do not want to intrude into the specifics of or to unduly hinder the Board in its lawful operation of the local school system, but we cannot remain oblivious to plaintiffs' valid constitutional objections. Therefore, we have attempted to protect the rights of plaintiffs without setting forth a detailed and rigid plan for accomplishing the necessary goals of proper notice and staff desegregation. We recognize that it is the responsibility of the Board to set policy and operate the schools, but it is also the positive duty of the Board to operate its schools according to the dictates of the law. We prefer to rely at this time on the flexibility afforded by setting forth the duties of the Board and allowing the Board to handle its duties according to the reasonable dictates of its expertise, guided, of course, by the continuing jurisdiction of the Federal District Court. The hour for the luxury of flexibility, however, is about over. If the Board is unable to discharge its duty to bring about, in a reasonable manner of its choosing, a final end to unlawful discrimination, the Courts will have no choice but to impose further demands to insure at last to this community the individual, personal constitutional rights to which it has been long entitled but too long denied.

The present Board, contrary to the views of some of the interested parties, is bound to comply with the past Orders and directives of this Court and of the District Court. Failure to so comply could be the basis for contempt proceedings to enforce compliance. Again we stress that the primary responsibility for solving the problems of school integration and of operating a non-racial school system devoid of distinction based on race rests squarely upon the school board and its administrators. Brown v. Board of Education of Topeka, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). That this affirmative responsibility has not been discharged is convincingly shown by the necessity of the plaintiffs having to file suit to enforce their reasonable requests and their constitutional rights to attend an integrated school located in their general attendance area. The District Court suit corrected their individual situation but left the rest of their class subject to the same discrimination. The time has now arrived and is in fact long overdue for the Board to implement its announced good intentions, which we do not doubt, to fully achieve a non-racially operated school system in which all pupils are accorded their full constitutional rights.

### ATTORNEY FEES

The District Court awarded $250 attorney fees to plaintiff Moore because of the Board's apparent unreasonable denial of her right of choice. However, further attorney fees were denied. Plaintiffs feel this was error. Although the District Court has power to so order, attorney fees in cases of this nature are not awarded as a matter of course. The grant or denial of attorney

fees is a matter wholly within the sound discretion of the trial court, which may be reviewed only for abuses of that discretion. Kemp v. Beasley, supra. While we believe additional fees were warranted, we do not believe that this is such an extraordinary case that we could validly hold that the trial court has abused its discretion in not awarding additional attorney fees. We do not exercise discretion in this field, we only pass upon abuse.

However, the time has lapsed for experimental policies proved ineffective. The Board is under an immediate and absolute constitutional duty to afford non-racially operated school programs, and it has been given judicial and executive guidelines for the performance of that duty. If well known constitutional guarantees continue to be ignored or abridged and individual pupils are forced to resort to the courts for protection, the time is fast approaching when the additional sanction of substantial attorney fees should be seriously considered by the trial courts. Almost solely because of the obstinate, adamant, and open resistance to the law, the educational system of Little Rock has been embroiled in a decade of costly litigation, while constitutionally guaranteed and protected rights were collectively and individually violated. The time is coming to an end when recalcitrant state officials can force unwilling victims of illegal discrimination to bear the constant and crushing expense of enforcing their constitutionally accorded rights.

## CONCLUSION

As pointed out, the approved plan is generally proper but is deficient in two important aspects, (1) lack of adequate notice for annual "freedom of choice," and (2) lack of a definite plan of staff desegregation. Therefore, the order of the District Court approving the plan is reversed insofar as it does not conform with the requirements set out herein. Owing to the necessity of changes in the plan and the disclosure of possible abuses in the operation of the plan, the case is remanded to insure that the additional requirements of a valid plan are inserted and that the future operation of the plan is in conformity with the views expressed herein. The District Court shall retain jurisdiction to insure (1) that a constitutionally accepted plan is adopted and (2) that it is operated in a constitutionally permissible fashion so that the goal of a desegregated, non-racially operated school system is rapidly and finally achieved. The District Court, in equity, has the power to fashion its decrees to insure and compel this result. In all other respects the order of the District Court is affirmed.

Affirmed in part, reversed in part, remanded.