Delois YARBROUGH et al., Appellants,

v.

The HULBERT–WEST MEMPHIS SCHOOL DISTRICT NO. 4 OF CRITTENDEN COUNTY, ARKANSAS, et al., Appellees.

No. 18693.

United States Court of Appeals
Eighth Circuit.

July 26, 1967.

Henry M. Aronson, New York City, for appellants; Jack Greenberg and Michael Meltsner, New York City, and George Howard, Jr., Pine Bluff, Ark., with him on the brief.

Herschel H. Friday, Little Rock, Ark., for appellees; G. Ross Smith, Little Rock, Ark., with him on the brief.

Before VAN OOSTERHOUT, BLACKMUN and LAY, Circuit Judges.

BLACKMUN, Circuit Judge.

We are concerned here with the desegregation of faculty and staff of public schools in West Memphis and surrounding territory in Crittenden County, Arkansas.

The plaintiffs are negro minors attending schools in the defendant school district. They instituted this civil rights class suit in equity under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 on January 28, 1965, and assert that they have been deprived of the Fourteenth Amendment guaranties of due process and equal protection. The defendants are the district, its superintendent, and the members of its board. The prayer is for the usual injunctive relief or, in the alternative, for a decree directing the presentation of a plan of reorganization of the school system, both students and faculty, on a nonracial basis and for the retention of jurisdiction by the district court pending full implementation of the plan. The defendants, by their answer filed in February 1965, allege that "In the past, the schools and professional staffs [of the district] have been completely segregated", and that "There has been no integration of the schools in the defendant District"; admit that all the plaintiffs in 1964 filled out transfer forms requesting attendance at schools theretofore exclusively white and that these requests were denied; and ask that the complaint be dismissed or, if injunctive relief is given, that the defendants be afforded an opportunity to present a plan "calling for the gradual desegregation of the schools of the District".

A hearing was held by the district court on March 8, 1965. At the close of that hearing the court ordered the defendants to desegregate the schools of the district but gave them an opportunity to formulate and file a desegrega-

tion plan. The defendants filed their plan with the court on April 20 and moved that it be approved. This called for desegregation to begin with the six lower grades in the 1965–66 school year and to be completed by the 1967–68 school year; for freedom of choice procedure; for nondiscriminatory bus transportation beginning in the fall of 1965; for desegregation at that time of faculty, teachers' and principals' meetings and of in-service workshops; and for undertaking and completing "as expeditiously as possible the desegregation of the teachers and professional staff". The plaintiffs filed objections to the plan and the defendants responded to those objections.

Another hearing was held on May 26, 1965. Judge Young then issued his decree on June 18, 1965, approving the proposed plan and authorizing the defendants to proceed under it. The court's supporting memorandum is reported as Yarbrough v. Hulbert-West Memphis School Dist., 243 F.Supp. 65 (E.D.Ark. 1965). That memorandum, pp. 66–69, reviews the details of the plan as then formulated and the plaintiffs' objections to it. We need not reiterate those details and objections. The memorandum also recites the pertinent facts, pp. 69–71, which, similarly, need not be repeated here. We only mention, in general terms, the recent fast growth of the West Memphis community; the complete segregation of the district's schools prior to the fall of 1965; an approximate 4-5 ratio of Negroes to whites; the construction of all presently used school buildings since 1947 and of all but one negro school and three white schools since 1954; the offering of "substantially the same curriculum" at the various schools; and efforts in the direction of achieving equality in teaching.

The plaintiffs filed a notice of appeal from the district court's decree. Within four months, however, this court's opinion in Kemp v. Beasley, 352 F.2d 14 (8 Cir. 1965), was handed down. There it was held, among other things, pp. 20–23, that a transitional period of three years is not in itself unreasonable; that, however, with freedom of choice available initially only in lower grades, the three year period proposed in that case was unreasonable for students "in the last years of their education"; that "At this late date the administrative problems of the Board may not be used as a tool to deprive individuals of their long-denied right to attend nonsegregated schools"; that the plan "must provide students now attending the eleventh and twelfth grades the right to complete their schooling in a nonsegregated school"; that freedom of choice "is a permissible method at this stage"; that, however, as used in the plan then before the court, freedom of choice "has fatal faults" in not affording a meaningful choice annually and in the perpetration of dual attendance zones for those children who fail to exercise a choice; that a meaningful and bona fide choice must be afforded annually, be exercised under reasonable regulations and be sufficiently publicized; and that failure to integrate the teaching staff is proscribed and was to be corrected during the transitional period. This court also there held, pp. 18–19, that while the HEW guidelines "must be heavily relied upon", they were not conclusive on the courts; that it is for the courts alone to determine when the operation of a school system violates constitutional rights; and that courts should endeavor to model their standards after the executive's guidelines.

Presumably in response to Kemp v. Beasley, the present plaintiffs then moved to dismiss their appeal and, as both briefs state, "the parties agreed to amend the plan". This court granted that motion to dismiss. The defendants thereupon amended their proposed plan to permit eleventh and twelfth grade negro students to announce and have honored, subject to overcrowding, their school assignment preferences for the last semester of the 1965–66 school year; to provide for school assignment preferences annually; to eliminate biracial attendance zones; and to require a report to

the court, by a specified date, as to the status of teacher and staff desegregation. The district court, on February 10, 1966, approved the plan as so amended. In May, pursuant to their commitment thus undertaken, the defendants filed a report dealing with the status of teacher and staff desegregation. This concerned the then approaching 1966–67 school year and recited (a) the conduct of all faculty, teachers' and principals' meetings and in-service workshops on an integrated basis; (b) the elimination of salary differentials based on race; (c) procedure to adjust contracts so that teachers are employed subject to assignment to any school of the district, this, however, not being committed for completion in 1966–67; and (d) the continuation of the study of the faculty desegregation problem described as "probably the most complex single problem in the overall desegregation effort". The plaintiffs responded that the report on teacher desegregation was "vague and indefinite", did not provide for desegregation or assign teachers on a nonracial basis, and did not comport with the Fourteenth Amendment.

In September the defendants filed a further amendment to the plan. This recited (a) the employment of a white federal coordinator to supervise all schools ("Most of his work is done with Negro children"); (b) the employment of a white cafeteria supervisor for schools attended by both whites and Negroes; (c) the employment of a white social worker for schools attended by both whites and Negroes ("Most of her work is done with Negro children"); (d) the employment of a team of one white nurse and one negro nurse for schools attended by both whites and Negroes; (e) the employment, on a half-time basis, of a white supervisor for the elementary schools attended by negro children ("this is more important in the implementing of the overall staff desegregation problem than any teaching or other staff position"); (f) the inauguration of a "completely integrated" special education program, with one white teacher and one negro teacher in a predominantly white elementary school; (g) the employment of a negro music teacher in the elementary schools attended predominantly by white children; and (h) the scheduling of positions for a negro librarian at the predominantly white junior high school and for a white librarian at the negro junior high school.

The plaintiffs in their brief point out that, as disclosed by answers to interrogatories:

"During the first year of the plan's operation, the 1965–1966 school year, 30 of the 2816 Negro students in the system attended white schools and no white students attended Negro schools. A four classroom addition to the Jackson Elementary School was constructed and an all Negro faculty was assigned to it. The school board created 22 new teaching positions and hired 45 new teachers, 26 white and 19 Negroes; all of the new white teachers were assigned to white schools and all of the new Negro teachers were assigned to Negro schools. None of the system's 125 white teachers taught at a Negro school and none of the 94 Negro teachers taught at a white school.

"As the new school year, 1966–67, started 115, or 3% of the 3029 Negro students in the School District were attending white schools. No white students were attending Negro schools. The School Board added 21 teachers, increasing its faculty from 219 to 240 and employed 31 teachers for the first time. Of the newly hired teachers 20 are white and 11 are Negro. All of the new white teachers were assigned to white schools and all of the new Negro teachers were assigned to Negro schools." [footnotes omitted]

On September 29, 1966, the district court concluded that the steps so taken by the defendants "represent a meaningful start toward desegregation of the faculty and may be constitutionally adequate for the time being". It felt, however, that the report was lacking "in concrete expressions of intent of the Board"

and should be amplified in a way suggested by the court. The file does not appear to contain the letter response at this point from the defendants' counsel but both sides, by their briefs, indicate that that letter provided the very declaration of policy, as to the filing of teaching and staff vacancies, which the district court was suggesting and which it had theretofore recently approved in another Arkansas case.

The district court on October 27, 1966, approved the defendants' plan as so amended and dismissed the case at defendants' costs.

The plaintiffs then filed a motion for a new trial or to amend the judgment on the grounds that the faculty plan was vague and non-specific and that the dismissal of the case was improper. The plaintiffs stated that they "desire an opportunity to investigate faculty and staff desegregation in the district", and that they "have retained an educational expert who intends to survey the school system and to bring his findings to the attention of the court". Further interrogatories were proposed by the plaintiffs. The court ruled that the motion attempted to reopen the case after submission and disposition and was untimely, and that continuing supervision for an indefinite time in the future was not necessary, in view of applicable HEW regulations, and would needlessly interfere with the orderly administration of the court's docket. It observed that plaintiffs in cases of this kind graduate or leave school and have no further interest in the case. The plaintiffs' motion was thereupon denied. They appeal.

Only two issues are presented to us for decision. The plaintiffs complain here (a) of that feature of the plan, as now amended, which relates to faculty and staff integration and (b) of the district court's failure to retain jurisdiction. All other aspects of the plan, including the three year period for student integration, with completeness to be achieved in the 1967–68 school year soon to begin, the choice procedure, and the notice provisions, are not here attacked.

A. Faculty and staff integration. This court has touched upon this problem before. It was raised as an objection to the plan proposed in Kemp v. Beasley, supra, p. 18 of 352 F.2d, and in response to the point this court said, pp. 22–23:

"Plaintiffs also complain that the Court did not order faculty and staff desegregation. The Court recognizes the validity of the plaintiffs' complaint regarding the Board's failure to integrate the teaching staff. Such discrimination is proscribed by Brown and also the Civil Rights Act of 1964 and the regulations promulgated thereunder. The Court feels, however, as did the District Judge, that this is a situation which will be corrected by the Board during the transitional period. The District Court retains jurisdiction of this matter and with its equity powers may issue any order or orders necessary to bring into being a reasonable nondiscriminatory policy of employment of teachers without regard to race."

We adhered to these observations when we dealt with the problem of negro teacher displacement in Smith v. Board of Educ., 365 F.2d 770, 778 (8 Cir. 1966). There we specifically observed that school personnel problems were among those which the Supreme Court has recognized as requiring solution in desegregation situations, Brown v. Board of Educ., 349 U.S. 294, 300–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and that the Supreme Court has indicated positively that nondiscriminatory allocation of faculty is indispensable to the validity of a desegregation plan. Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L. Ed.2d 187 (1965); Rogers v. Paul, 382 U.S. 198, 200, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965).

Again, in Clark v. Board of Educ., 369 F.2d 661 (8 Cir. 1966), this court dealt with the staff integration problem. We noted that the board resolution there was no more than a declaration of intention and did not contain a commitment:

"It is clear that the Board may not continue to operate a segregated teach-

ing staff. * * * It is also clear that the time for delay is past. The desegregation of the teaching staff should have begun many years ago. At this point the Board is going to have to take accelerated and positive action to end discriminatory practices in staff assignment and recruitment. * * * [F]uture employment, assignment, transfer, and discharge of teachers must be free from racial consideration. * * * [W]henever possible, requests of individual staff members to transfer into minority situations should be honored by the Board. Finally, we believe the Board should make all additional positive commitments necessary to bring about some measure of racial balance in the staffs of the individual schools in the very near future. * * * We are not content at this late date to approve a desegregation plan that contains only a statement of general good intention. We deem a positive commitment to a reasonable program aimed at ending segregation of the teaching staff to be necessary for the final approval of a constitutionally adequate desegregation plan. * * * [T]he District Court should require the Board to include in its plan a positive program aimed at ending in the near future the segregation of the teaching and operating staff". Pp. 669–670 of 369 F.2d.

We refrained at that time from imposing "a set timetable" but directed the trial court to retain jurisdiction to insure the adoption of a constitutionally acceptable plan and its operation in a constitutionally permissible fashion.

In Kelley v. Altheimer, Arkansas Public School Dist., 378 F.2d 483, 493–494, (8 Cir. 1967), after reviewing *Kemp, Smith* and *Clark* and citing other cases, this court said:

"From these decisions, it is clear that affirmative action must be taken by the Board of Education to eliminate segregation of the faculty. While this may well be the most difficult problem in the desegregation process, it has been made more difficult by the failure of the Board to desegregate the faculties by filling vacancies on a nonracial basis." [footnote omitted]

See also United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 868, 892–894 (5 Cir. 1966) and, en banc, 380 F.2d 385 (5 Cir. 1967); Board of Educ., etc. v. Dowell, 375 F.2d 158, 167 (10 Cir. 1967); Wheeler v. Durham City Bd. of Educ., 363 F.2d 738 (4 Cir., en banc, 1966); Lee v. Macon County Bd. of Educ., 267 F.Supp. 458, 472 (M.D.Ala. 1967).

It is inescapably clear, therefore, that segregation in faculty and staff for some time now has not been, and certainly no longer is, constitutionally permissible and that this fact has been repeatedly stressed in the several integration cases which in recent years have come to this court. The appellee school district here and its counsel do not argue otherwise. They stress, rather, "the delicate balance between the desirability of faculty desegregation and the preservation of some semblance of educationally sound relationships between teachers and their students"; the difficulties inherent in faculty desegregation, which the Fifth Circuit recognized in its recent *Jefferson County* opinion, supra, p. 892 of 372 F.2d, and which this court recognized in *Clark*, supra, p. 669 of 369 F.2d, and in *Altheimer*, supra, p. 493 of 378 F.2d; and the fact that teaching is an art, as this and other courts have noted, see Smith v. Board of Educ., supra, pp. 781–782 of 365 F.2d, and cases there cited.

But *Clark*, decided since the present action was instituted and since the entry of the district court's orders in this case, sets the standard for this circuit. Again we repeat only what was said there, pp. 669–670 of 369 F.2d: (1) a school board may not continue to operate a segregated teaching staff; (2) such desegregation should have been begun many years ago; (3) the board must take accelerated and positive ac-

tion to end discriminatory practices in assignment and recruitment; (4) employment, assignment, transfer and discharge of teachers must be free from racial consideration; (5) whenever possible, requests of faculty and staff to transfer into minority situations should be honored; (6) a board should make "all additional positive commitments necessary to bring about some measure of racial balance in the staffs of the individual schools in the very near future"; (7) we are not content at this late date with a plan which contains only a statement of general good intention; and (8) a positive commitment to a reasonable program is necessary. We adhere to these principles enunciated in *Clark*. We do not encourage and we may not countenance delay.

This brings us to the problem of remedy. In Kemp v. Beasley, supra, p. 22 of 352 F.2d, decided in 1965, this court did not impose a faculty desegregation time schedule. We felt that the faculty situation would be corrected by that board during the permitted transitional period ending with the 1967–68 school year. In *Clark*, supra, pp. 669–670 of 369 F.2d, we similarly refrained from the imposition of "fixed mathematical requirements" and, instead, charged the district court with responsibility for requiring appropriate faculty and staff provisions. In *Altheimer*, supra, pp. 498–499 of 378 F.2d, this court did direct complete desegregation of faculty no later than the beginning of the 1969–70 school year and to that end specifically required, among other things, the filling of vacancies by way of minority assignments, the encouragement of voluntary transfers into minority situations, and, if this were to fail, the making of formal assignments to minority situations.

■ For the present case we conclude, although not without some hesitancy, not to lay down any mathematical formula or fixed time schedule. On this record we chose not to direct but instead firmly to suggest and thus to emulate what was done in *Kemp* and *Clark* rather than what was done in *Altheimer*. We make

this choice because we regard *Altheimer* as presenting a more extreme fact situation and because we have confidence in Judge Young's discretion and in his sense of constitutional obligation and, until it is otherwise demonstrated, in this school board's willingness, under the guidance of able and experienced counsel, to comply with constitutional dictates as they now have become more clear in cases decided since the hearings by the district court and the entry of its orders. We note that student integration, at least on presently accepted standards, is to be fully effectuated with the coming school year; that segregated transportation has been eliminated; that faculty and staff meetings and workshops are integrated; that a declaration of intent to desegregate faculty and staff, albeit under district court suggestion, has been adopted as a matter of district policy and by way of positive pledge; that the board accepts, by expression in its brief here, our directive in the *Morrilton* case [Smith v. Board of Education of Morrilton School District, 8 Cir., 365 F.2d 770] as to absorption of any personnel displaced in the integration process; that applicants for employment are now expressly subject to assignment without regard to race; that salary differentials based on race have been eliminated; and that substantial progress has been made in the integration of those staff assignments which complement formal classroom teaching. All this, of course, is not enough. The faculty and staff, with a few exceptions, so far as this old record shows, remain segregated. But we feel that the necessary additional progress, and indeed complete progress, will better be imposed, in this situation and upon the record which is before us, under positive direct guidance of the district court rather than by mandate from us. If this confidence in court, board and counsel proves to be misplaced, this court will be available for more specific direction.

By way of firm suggestion, however, we observe again that the 1969–70 school year was employed by this court in *Alt-*

*heimer* as the final time for complete faculty and staff desegregation and, evidently, by the Tenth Circuit in Board of Educ. v. Dowell, supra, 375 F.2d 158; that the opinion in *Altheimer* affords examples of steps which can be taken to effect faculty and staff desegregation; that an acceptable plan must embrace positive measures to be accomplished over a limited time in the attainment of the goal; and that hiring and assignment on a segregated basis, indulged in through 1966–67 must cease. These factors are commended to the district court and to counsel with the thought that a substantial forward step be forthcoming for 1967–68 with full and effective faculty and staff integration hopefully by 1968–69 and in no event later than the beginning of the 1969–70 school year. Other factors and other details undoubtedly will appear or come to mind as the board proceeds on its way toward resolution of the problem.

We say in passing that this panel does not regard *Altheimer* as imposing any rigid mathematical formula which, in certain situations, could itself be arbitrary and without educational significance. We regard that case as one requiring a reluctant school board to get on with its task of achieving faculty and staff desegregation and assignment to comport with equitable and constitutional requirements divorced from racial considerations. Numbers and percentages per se are not the ultimate answer but, up to a point, they touch upon realities. This, we think, is the significance of *Altheimer*.

 B. The retention of jurisdiction. Despite such inconvenience as the retention of jurisdiction may occasion to the district court and its personnel, despite the fact that the institution of a new lawsuit is an easy step and not expensive by way of court and service fees, despite the fact that teen-age plaintiffs do grow older and graduate or leave school, and despite the possibility of greater uniformity under HEW guidelines than under court supervision, what we have said makes retention of jurisdiction in this case essential and, indeed, imperative. We noted and relied on such retention in Kemp v. Beasley, p. 22 of 352 F.2d, and we directed it, after district court dismissals, in *Clark*, supra, pp. 667, 670 and 671 of 369 F.2d, and in *Altheimer*, supra, p. 489 of 378 F.2d See, also, Brown v. Board of Educ., supra, p. 301 of 349 U.S., 75 S.Ct. p. 756; Robinson v. Willisville School District, 379 F.2d 289 (8 Cir. 1967); Norwood v. Tucker, 287 F.2d 798, 809 (8 Cir. 1961); Aaron v. Cooper, 243 F.2d 361, 364 (8 Cir. 1957).

Such retention, coupled with appropriate reporting, perhaps no less frequently than semi-annually, will tend to assure to these minor plaintiffs the fulfillment of rights which have been determined to be of constitutional magnitude and which heretofore have been denied to them. At oral argument, the defendants did not press the retention point and, we feel, conceded it in the light of our decision in *Clark*.

The district court's dismissal of the action is therefore vacated and the case is remanded for further timely proceedings in accord with the views herein expressed.

The mandate shall issue forthwith.

LAY, Circuit Judge (concurring).

I concur in Judge Blackmun's opinion. Because of counsel's oral argument I add here only additional comment for emphasis:

(1) This court said in Kemp v. Beasley, 352 F.2d 14, 21 (8 Cir. 1965):

"The dictum in *Briggs* has not been followed or adopted by this Circuit and it is *logically inconsistent with Brown and subsequent decisional law on this subject.*" (My emphasis)

(2) This court said in Kelley v. Altheimer, 8 Cir., 378 F.2d 483, 496:

"Undue reliance on the 'deliberate speed' language in the *Brown* case,

plus adherence to the dictum in *Briggs,* has resulted in a decision which makes it more difficult to achieve a non-racially operated school system."

Emphasized here again are the standards we have set forth before in *Kemp, Clark,* and *Altheimer.* This court has always felt the district court is better equipped to supervise the *positive steps* to accomplish compliance. *Altheimer* requires positive compliance with plans of desegregation under the supervision of the district court. This decision does nothing less. This requirement lays to final rest the dictum of *Briggs* in this Circuit. This case involves faculty assignment. We are dealing with one of the most pragmatic and effective areas where school administration has direct control to accomplish desegregation.

The exerted influence of a segregated faculty on any freedom of choice plan by students is unwholesome. It effectively limits voluntary choice by both colored and white students in substantial numbers. Clark v. Board of Educ., 369 F.2d 661 (8 Cir. 1966). The primary test of good faith in any plan of desegregation relates to faculty assignment. This is not a directive for numerical faculty integration. Appellant's counsel openly conceded this is not the goal sought nor is it necessarily the proper result to be accomplished. The considered qualifications of faculty are not to be restricted in any way. See Smith v. Board of Educ., 8 Cir., 365 F.2d 770 at 782. However, it is sometimes argued that placement or transfer of colored faculty to white schools will reduce the quality of education for the white pupils. This argument is the greatest admission of inequalities that continue to exist in a well intentioned but segregated school community. It deserves little discussion and serves no excuse.

The problem is not as complex as freedom of choice plans involving students. There is no excuse for immediate and realistic steps not to be taken to accomplish the desired results.