**Ceiners JACKSON et al., Appellants,**

v.

**MARVELL SCHOOL DISTRICT NO. 22 and C. G. Cowsert, Superintendent of Schools, Appellees.**

**No. 18762.**

United States Court of Appeals
Eighth Circuit.

Feb. 6, 1968.

John W. Walker, Little Rock, Ark., for
appellants; Jack Greenberg and Michael

Meltsner, New York City, were on the brief and reply brief with John W. Walker, Little Rock, Ark., Michael J. Henry, New York City, was also on the reply brief.

Robert V. Light, Little Rock, Ark., for appellees; Charles B. Roscopf, Helena, Ark., and Herschel H. Friday and G. Ross Smith, Little Rock, Ark., were on the brief with Robert V. Light, Little Rock, Ark.

Before VOGEL, Chief Judge MATTHES and BLACKMUN, Circuit Judges.

MATTHES, Circuit Judge.

Appellants, plaintiffs below, are Negro students who challenge the validity of a desegregation plan proposed by the Marvell School District, Phillips County, Arkansas, which was approved by the district court on December 21, 1966.[1] The court retained jurisdiction of the cause during the period of transition to a desegregated school system. This appeal followed.

We review briefly in chronological order the relevant facts. In September, 1965 the Board of Directors of the Marvell School District inaugurated a "freedom of choice" desegregation plan patterned after the guidelines of the Department of Health, Education and Welfare (HEW). Under this plan grades one through four were to be desegregated in 1965, grades five through eight in 1966, and grades nine through twelve in 1967. During the 1965-66 school year only seventeen out of approximately 1,700 Negro pupils exercised a choice to attend predominantly white Marvell schools.

On April 9, 1966 the HEW guidelines were revised to require an acceleration of school desegregation. These revised guidelines required the inclusion of specific provisions in every freedom of choice plan as well as the attainment of a certain percentage of racial balance in student assignments. The Board, however, stoutly refused to adopt or comply with the revised guidelines on the ground that they were unworkable in the Mar-

vell School District, and accordingly proceeded to formulate its own desegregation plan tailored to the needs of the District.

Adoption of such a plan, however, was impeded by a mass boycott of Negro students who refused to attend school at the commencement of the 1966-67 school year. This action apparently precipitated a hearing before the district court on September 20th, at which both parties attempted to bring about an orderly resumption of school operations. Counsel for both parties recognized the seriousness of the situation resulting from the boycott, and were in agreement that prompt action had to be taken to bring order out of the chaotic situation. Accordingly, an interim plan was proposed by school authorities for concluding the boycott and extending the freedom of choice plan. The district court, Honorable Oren Harris, acted with dispatch and on September 23rd filed an order approving an "interim proposal" for desegregation of the Marvell School District. In compliance with the court order the Board on October 20th filed a report of the action taken to implement the interim plan and the results achieved under it. That report reveals that 120 eligible Negro students requested and received assignments to predominantly white schools for the 1966-67 school year. Out of this number 103 of the applicants registered and were attending these schools as of October 12, 1966. Thereafter, the court directed the Board to file a modified plan of desegregation which is the subject of this controversy.

Although this case comes before us on a very meager record, we are able to glean the following facts from the September 20th hearing. Approximately 80% or 1,700 out of a total 2,000 to 2,100 students in the School District are Negroes. The pleadings disclose that the defendant School Board is operating one predominantly white school, encompassing grades one through twelve, and four predominantly Negro schools, only one of which includes grades one through

---

1. Unless otherwise stated all dates refer to the year 1966.

twelve. The size or capacity of the school buildings is not disclosed. Counsel for plaintiffs, however, stated at the hearing that portable classrooms were utilized at one of the predominantly Negro schools, and suggested that consideration be given to moving such facilities to the predominantly white school in order to alleviate the possibility of overcrowding at the latter.[2]

Prior to the approval of the plan under scrutiny, Judge Harris notified counsel that he would be in Helena, Arkansas on December 5th and 6th for other court business and would entertain "any problem regarding this case." Appellants did not appear at this time nor did they file any written or oral objections to the plan prior to its approval by the court on December 21st.

### THE PLAN

The plan as approved by the district court envisions the elimination of segregation by giving both Negro and white students the opportunity to select, through the choice of their parents, the schools which they desire to attend. During the first week in May, 1967, copies of the plan and a choice form for the 1967–68 school year were required to be distributed to all students in grades one through twelve. During a fifteen day period following distribution, each student had the option, but was not required, to execute the choice form and return it to the School Board. The only exception to this discretionary feature of the plan related to new students enrolling in the District for the first time, including those entering the first and seventh grades, who, commencing with the 1967–68 school year and annually thereafter, were required to execute a choice form. For the 1967–68 school year only, students were to be assigned to the school of their choice unless their selection resulted in overcrowding, in which event preference of choice would

depend on the proximity of the school to the home of the students choosing it. For the 1967–68 and subsequent school years the plan embodied the following features:

A. *Exercise of Choice*—Parents or other adults in loco parentis, and not the students themselves, must execute the choice forms.

B. *Distribution*—Copies of both the plan and choice form were to be freely available to parents and students at each school.

C. *Commitment*—A choice once made was binding for the entire school year except in cases of compelling hardship.

D. *Lateral transfers*—During the first fifteen days of May, 1968, and during the same period in each subsequent year a student may apply for a transfer to another school which will be granted as a matter of course unless overcrowding occurs.

E. *Overcrowding*—In the event of overcrowding as the result of applications for lateral transfers during the 1968–69 and subsequent school years, students will continue to be assigned to their present school.

F. *Advice and Counseling*—Upon request of a student, parent or person in loco parentis, the professional staff of each school may advise and counsel students and parents concerning the exercise of their choices.

G. *Transportation*—School bus transportation shall be afforded on a nonracial basis, and each student will be assigned to a bus serving the school he attends.

H. *Facilities*—All students shall be entitled to the equal use of every school sponsored facility, activity or service available at the school to which he is assigned.

I. Faculty—Vacancies on the professional and teaching staff shall be filled by employment of the best qualified,

---

2. In response to this suggestion Judge Harris stated:

"Well, the Court is not in a position to pass on that at this time. After all, we cannot be moving school houses or portable school houses, working out bus transportation problems, and the shifting of faculties and all in just a few days—that all takes time—so I think with the patience and tolerance I hope we may have, I am sure this matter can be worked out."

available applicant without regard to race.

Appellants in general are dissatisfied with all aspects of the freedom of choice plan and attack its efficacy as applied to the Marvell School District. In particular they single out the provisions relating to (1) faculty desegregation; (2) notice requirements; (3) exercise of the choice; (4) overcrowding; (5) advice and counseling; (6) bus transportation; (7) school equalization and use of school facilities.

■ This Court has firmly committed itself to the principle that the freedom of choice plan is not unconstitutional per se, and that it may represent an appropriate, transitional link in effectuating a program of total school desegregation.[3] Kemp v. Beasley, 389 F.2d 178 (8th Cir. 1968) (Kemp II); Kelley v. Altheimer, 378 F.2d 483 (8th Cir. 1967) (Altheimer); Clark v. Board of Education of Little Rock School Dist., 369 F.2d 661 (8th Cir. 1966) (Clark); Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965) (Kemp I). We have correspondingly recognized and held that where a freedom of choice plan fails to accomplish meaningful desegregation of a school system, the Board has the duty to adopt procedures which will comport with the teachings of the Supreme Court and this Court to the end that the school system will be desegregated in fact rather than in theory.

■ The instant plan has been in operation for a relatively brief period of time. There is nothing before us to indicate what results have been or can be produced under it.[4] Consequently, we are not inclined on the basis of this record and at this early date to hold that the freedom of choice method of desegregation constitutes a totally unworkable and impracticable vehicle for eliminating the vestiges of segregation in the Marvell school system.

Appellants assert that the plan does not provide for the exercise of an annual choice as required in Kemp I and Clark. We do not believe Kemp I is apposite. There the students were afforded only three opportunities during their twelve years of schooling to exercise a choice of schools. Unlike the lateral transfer provisions of the plan before us the freedom of choice plan in Kemp I conditioned reassignments or lateral transfers on the existence of unusual or exceptional circumstances. While the present plan grants the majority of students the option to execute a choice form only for the 1967–68 school year, it nonetheless retains the substance of an annual choice by permitting these same students to annually apply for a lateral transfer to a school of their preference. On the other hand, almost identical lateral transfer provisions, giving the student an annual right to transfer schools met with our approval in Clark. 369 F.2d at 667–668.

We can make no forecast as to the ultimate effectiveness of the choice and transfer provisions. We do, however, unhesitatingly suggest that if such provisions prove inadequate or are administered discriminatorily so as to prevent full desegregation of the School District, the School Board should be required to act responsibly and adopt a procedure

3. We note, however, from 389 U.S. 1003, 88 S.Ct. 565, 19 L.Ed.2d 598 (December 12, 1967) and 389 U.S. 1034, 88 S.Ct. 783, 19 L.Ed.2d 822 (January 16, 1968) that the Supreme Court has recently granted certiorari in two cases to review the validity of the freedom of choice plan as an appropriate vehicle to effect school desegregation. Raney v. Board of Education of the Gould School Dist., 381 F.2d 252 (8th Cir. 1967); Green v. County School Board of New Kent County, Virginia, 382 F.2d 338 (4th Cir. 1967). In Raney, supra, one of the questions before the Supreme Court is:

"(1) Does Arkansas school board's 'freedom of choice' desegregation plan satisfy [the] Fourteenth Amendment even though it perpetuates racially identifiable schools, and practical, economical, and educationally superior alternative would disestablish dual system?"

4. Counsel for appellant, however, advised us during oral argument that approximately 235 Negro students under the present plan have been assigned to predominantly white schools for the 1967–68 school year.

which will insure full attainment of the constitutional rights of all students in the District.[5]

■ We believe and hold that the provision for desegregation of the faculty is wholly inadequate and should be amended to provide a more meaningful approach towards actual desegregation of the faculty and professional staff. It merely provides that "vacancies on the teaching and professional staff shall be filled by employment of the best qualified available applicant without regard to race * * *." Viewed realistically, this constitutes nothing more than a declaration of intention without the presence of meaningful steps to implement that intention. Conspicuous by its absence is any provision relating to the voluntary transfer or compulsory assignment of members of the faculty from one school to another. In short the plan lacks any affirmative provisions calculated to bring about some measure of racial balance in the faculty and professional staffs of the Marvell schools.

The question of faculty desegregation has been fully explored by this Court in prior decisions. See, e. g., *Kemp II*, supra; Yarbrough v. Hulbert-West Memphis School Dist., 380 F.2d 962 (8th Cir. 1967); *Altheimer*, supra; *Clark*, supra; Smith v. Board of Education of Morrilton School Dist., 365 F.2d 770 (8th Cir. 1966); *Kemp I*, supra. In light of the thorough analysis of this problem in these cases, we deem it wholly unnecessary to reiterate the principles which are to govern desegregation of the faculty and professional staff.

■ We need only reaffirm what we stated in *Clark*, supra, that affirmative action must be taken to achieve a racial balance in faculty distribution:

"* * * [W]e believe the Board should make all additional positive commitments necessary to bring about some measure of racial balance in the

staffs of the individual schools in the very near future. * * * The lack of a definite program will only result in further delay of long overdue action. We are not content at this late date to approve a desegregation plan that contains only a statement of general good intention. We deem a positive commitment to a reasonable program aimed at ending segregation of the teaching staff to be necessary for the final approval of a constitutionally adequate desegregation plan." 369 F.2d at 669–670.

■ If meaningful desegregation of the faculty and staff is to be accomplished in accordance with the principles enunciated in our prior decisions, the Board should be required to take affirmative action to (1) encourage voluntary transfers from majority to minority staff situations; (2) assign members of the faculty and staff from one school to another.

In this connection this Court in *Altheimer* fixed the 1969–70 school year as a completion date for full faculty and staff desegregation. In *Yarbrough* we firmly suggested that full and effective faculty and staff integration be accomplished no later than the beginning of the 1969–70 school year. In *Kemp II* we required the Board to file with the district court on or before the date fixed by the court a report setting forth the details for faculty desegregation commencing with the 1968–69 school year. *Kemp II* also required complete faculty desegregation no later than the 1969–70 school year. We are of the view that these requirements should be applicable to the Marvell School District and therefore suggest that the district court direct the Board to act accordingly.

■ We also believe that there is merit in appellants' contention that the notice provisions in the freedom of choice plan do not adequately apprise either

5. In this connection Paragraph IV of the plan, embodying the lateral transfer provision, states:
"For educational reasons universally recognized to be sound, the policy of

this District is opposed to lateral transfers from one school to another within the District."

parents or students of their annual right to make a choice of schools. Under the plan, for the 1967–68 school year only, the School District is required to distribute to each student a copy of the plan and a choice form on May 1, 1967. For the 1968–69 school year and thereafter no affirmative action is required to inform students or parents of the plan or to provide a choice form. Paragraph II (d) merely states that copies of the plan and of the choice form shall be freely available to parents and students at each school. Such a provision does not satisfy the requirements enunciated in *Clark* and *Kemp II*. This plan should be modified to comport with our holding in those cases.

■ We are not disposed at this time to condemn the provision requiring the choice forms to be executed only by parents of the students or those in loco parentis. Assuming *arguendo* that students entering the ninth grade or higher, or students who have reached the age of fifteen, may be capable of making an intelligent and unfettered choice of schools, we do not believe that restricting the exercise of that choice to the parents constitutes an infringement of the students' constitutional right to attend a desegregated school. In our view the assumption is fully warranted that the best interests and welfare of their children will be uppermost in the minds of the parents in exercising a choice.

■ The potential overcrowding of the predominantly white school presents a perplexing problem. We suspect this is true in most districts where there are large numbers of Negro students. Perhaps the problem reaches a greater dimension in this case because of the large disparity between Negro and white students. Whether application of the freedom of choice method will produce continuous overcrowding to the extent that desegregation in a meaningful manner will be thwarted is a problem which we cannot anticipate nor resolve on this record. Heretofore all choices and applications for lateral transfers have been honored as a matter of course, and there is no indication that overcrowding is an imminent problem. In the event overcrowding does occur, however, there are portable facilities now attached to the Negro school which apparently could be used to expand the capacity of the predominantly white school so that all requests to attend it could be granted. The School Board should not seize upon overcrowding as an avenue to escape from its obligation to desegregate, particularly if other facilities are available. We believe that under our suggestions and the guiding hand of the able district judge this problem can and will be solved.

■ Appellants complain of possible intimidation in the exercise of a meaningful choice by the students by allowing members of the professional staff to advise and counsel students and their parents with respect to their choices. We find no vice in this provision. Consultation is not mandatory, but discretionary "upon request of a parent, student or person acting as a student's parent." In view of this feature and the fact that suggestions by the staff are to be solely of an advisory nature, we fail to perceive how this provision, considered in context, will result in an intimidation of the students.

We have also considered appellants' allegation of discrimination in the operation of the school bus transportation under the plan.[6] Bus operations under the plan of desegregation did not commence until the 1967–68 school year, subsequent to the district court's approval of the plan and the appeal to this Court. The record therefore is necessarily silent with respect to the transportation of the students. Consequently, we have no basis upon which to ascertain the validity of appellants' charges on this point. With respect to the provisions of the desegregation plan itself, however, we have established guidelines in *Altheimer* and *Kemp II* with regard to the transportation of students. Those guide-

6. Under the provisions of the plan each student eligible for bus transportation was to be assigned to a bus serving the school he attended.

lines should be recognized and applied in this case.

Since the record is totally silent on the question of school equalization, we bypass appellants' claim that appellees are operating schools for Negro children which are substandard and inferior to those which are provided for white pupils.[7] If a subsequent evidentiary hearing discloses that such a situation does in fact exist the Board should adhere to our pronouncements in *Altheimer* and alleviate that condition.

■ We are not impressed with appellants' contention that the court erred in approving the desegregation plan without affording them an evidentiary hearing. At no time either prior or subsequent to its approval by the court did appellants offer any oral or written objections to the plan nor did they request an evidentiary hearing to voice their objections. On the contrary, even though they were offered the opportunity by Judge Harris, appellants failed to appear in court on December 5th or 6th to offer any objections to the plan. In any event we are satisfied that the district court will afford appellants a full evidentiary hearing if such should be necessary for proper implementation of a revised plan.

■ Appellants' request for allowance of attorney fees is denied on the basis of the principles outlined in *Kemp I*, supra, 352 F.2d at 23; and *Clark*, supra, 369 F.2d at 670–671. See also *Kemp II*, supra.

In conclusion we feel constrained to observe that all aspects of the procedures inherent in the desegregation of schools in the State of Arkansas have been fully explored and carefully considered by this Court in prior cases. We have enunciated the principles and standards which must be applied. Despite the teachings of this Court, and the mandate of the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), we find that some school boards continue to maintain a recalcitrant attitude toward desegregation of the schools in their districts. In this case it was not until 1965, some eleven years after *Brown I*, that the Board moved forward and adopted a plan. The hour is indeed late. School boards must face up to their constitutional obligation to adopt procedures which will provide more than lip service to desegregation.

We have the utmost confidence in the able and conscientious district judge, who by this record, has demonstrated a sincere desire to effectively eliminate the vestiges of segregation prevailing in the Marvell School District. We believe that under his supervision, with the good faith cooperation of the parties, all problems of substance can and will be satisfactorily determined so that this litigation will finally be terminated.

The cause is remanded for further proceedings in conformity with the views expressed herein.

---

7. Although not a part of the record, appellants have attached to their brief a purported copy of a letter from the Arkansas Department of Education, which indicates in substance that the Negro elementary and high schools do have an accreditation rating inferior to that prevailing in predominantly white schools in the Marvell School District.